**CITY OF DALLAS, Appellant,**

v.

**Morris Sheppard STEVENS et al., Appellees.**

No. 15397.

Court of Civil Appeals of Texas.
Dallas.

Feb. 7, 1958.

Rehearing Denied March 14, 1958.

H. P. Kucera, City Atty., Ted P. Mac-Master and Arthur Schroeder, Jr., Asst. City Attys., Dallas, for appellant.

Logan Ford, H. Sam Davis, Jr., A. J. Piranio and P. P. Ballowe, Dallas, for appellees.

DIXON, Chief Justice.

This is an appeal from a final judgment granting a mandatory injunction directing the governing body of the City of Dallas, Texas, to issue to appellees a renewal permit for the operation of a dance hall for a term of one year beginning June 17, 1957. The judgment further provided that should the City authorities fail to issue the said permit as directed, then the City and its officers, agents and employees were "commanded to desist and refrain from in anywise molesting or harassing plaintiffs or their employees in the running and operation of said dance hall without a permit." The Court had previously granted a temporary restraining order.

Appellees Morris Sheppard Stevens and Mrs. Jewel Hamilton filed suit against the City June 21, 1957. Appellees are the owners and operators of "Roundup Club," a night club and dance hall located at 2005 South Ervay Street in the City of Dallas. In their original and supplemental petitions appellees alleged that, purporting to act under authority of ordinances Nos. 3693, 6095, and 6706, the Chief of Police and City Council had refused to issue to appellees a dance hall permit, and had refused to allow them to operate a dance hall at the premises above named. They further alleged that said ordinances were invalid and unconstitutional, and that the action of Chief of Police and City Council in refusing to issue a permit was arbitrary and capricious, and bore no relation to the general welfare.

At the trial a jury was asked to find "from a preponderance of the evidence" (1) whether the City Council had acted arbitrarily, capriciously, and without relation to the public welfare in refusing to grant appellees a dance hall permit; and (2) whether the manner in which appellees operated the Roundup Club from April 25, 1956 to April 25, 1957 did not constitute a public nuisance. Both issues were answered in the affirmative—that is, in favor of appellees.

On July 31, 1957 the trial court rendered the judgment described in the first paragraph of this opinion.

### Evidence.

Appellees presented testimony from nineteen witnesses together with four exhibits in an effort to show that the refusal of the Council to renew their dance hall permit was arbitrary and capricious. Their testimony was to the effect that the Roundup Club was operated in an orderly manner,

and in compliance with the City's ordinances and rules regulating public dance halls.

The club, according to appellee Stevens, during the past year had about 185,000 customers. It has a seating capacity of 800 people at tables at one time. There are several cafes and taverns in the neighborhood which also serve beer. A liquor package store is nearby. A special police officer is assigned to the club by the City. His salary is paid by the club through the City. Under the City's rules and regulations for public dance halls, arrests made by the special officer are not counted against the record of the club. In January 1957 the Texas Liquor Control Board suspended the club's beer permit for five days on account of an argument which took place in the rest rooms. A police squad made arrests. The club has been in operation about twelve years.

Appellant City of Dallas presented nine witnesses and eight exhibits. Appellant contends that the testimony and exhibits constitute substantial evidence reasonably supporting the Council's action.

The pastor of a church located around a corner about a block and a half distant from the Roundup Club testified that the patrons of the club "create a very bad situation down there with respect to traffic, drinking, fighting, parking, one thing and the other." There is a parking lot nearby used by members of the church and patrons of the club. Patrons of the club have damaged cars belonging to church members. In one instance a man who came from the club knocked glass out of a church member's parked car. Cars of the church members have been pushed out into the street. Since the Roundup Club has been closed the church has not had the same trouble.

A day nursery has been operated for about 20 years by the Dallas Community Chest at 2017 South Ervay Street, which is in the same block with the Roundup Club. The nursery cares for forty to sixty-five children daily. The director testified that

after a week-end the nursery premises were littered with debris, whiskey and beer bottles. After the Roundup Club was closed "there weren't as many bottles * * * as when it was open."

Two blocks and a half from the Roundup Club is Compton Citadel, a youth center or club jointly sponsored by the Salvation Army and Boys Club of America. There are about 700 children and young people who use the club—its athletic facilities, woodcraft and other activities. The director of Compton Citadel testified that there "would be sort of a rough, rowdy attitude of many of the folk who go in and out" of the Roundup Club. The youth center is located in a congested area.

A witness whose home is in the neighborhood testified that he had often passed the Roundup Club on Saturday nights and Sunday nights and he had seen "quite a few people standing out in front of the Roundup Club talking and hurrahing and such like." Quite a few of these persons were in a state of intoxication.

W. P. Ganaway, Captain of Detectives of the Dallas Police Department in charge of the Special Service Bureau, testified. We quote excerpts from his testimony:

"Q. Why did you recommend that the license be denied? A. Because of the large number of arrests that had been made at that location for breaches of the peace; the large number of arrests made in the vicinity of that location, the people being arrested and attracted to that location by the presence of the Roundup Club. * * * A. The general reputation of the Roundup Club is bad, as far as the occurrences of breach of the peace is concerned.

"Q. State whether or not you have had a number of complaints about the activities of the Roundup Club in and around the Roundup Club? A. Yes, sir, we have had many complaints from the people that live around that neighborhood. * * * We have had a num-

ber of complaints from people that live in the neighborhood and around there, about the noise, the parking, the inconvenience that it has caused the neighborhood, the neighbors that live there, and we have had a large number of arrests that have been made in front of the place, and in general I would say that the reputation of that place is bad, as far as the breaches of the peace are concerned. * * *

"Q. How many 'on-view' arrests were made during that period? A. There was a total of forty-eight 'on-view' arrests made during that period.

"Q. That meant by officers coming in squads from the outside with no assistance whatever from the dance hall officers? * * * A. They were made by the officers working the district, the regular police officers and not made by the special officers of the dance hall, sir, working in the place. * * *

"Q. Do those records show, that you have, do they show what was the total number of arrests made with the total number including the 'on-view' arrests and those with the assistance of the dance hall officer during that one year period of time? A. Yes, sir.

"Q. What is the total number? A. A hundred and forty-one.

"Q. Now do you have any kind of a breakdown from your records there? A. Yes, sir.

"Q. All right. Will you tell the jury about how the types of offenses, what the breakdown shows, whether the dance hall officer made the arrest alone or whether they were strictly 'on-view' or what the outside officers made? * * * A. Yes, sir, the records here reflect from the total of them that there were 56 arrests made by the special officer, unassisted, and that there were 37 arrests made by the

police department and the special officer and 48 arrests made by the police department officers without the assistance from either the management or the special officer. * * *

"Q. All right, what categories, do you have a category, a breakdown of them as to what kind of offenses were involved? A. Yes, sir. * * * The arrest made by the police officers, the regular police officers, without assistance from the dance hall officer, or special officer, five for affray, or fighting, five for disturbing the peace, twelve for drunk and disorderly, two for interfering with a police officer, one for aggravated assault on a police officer, one for abusive language, eleven for prostitutes, vagrancy, two for minor-liquor law violation, one for check swindle, one for robbery by assault, two for investigation of burglary, and theft, two for contributing to the delinquency of a juvenile, two for violation of the State barbiturate law, one for investigation of the State barbiturate law, making a total of 48. * * * Arrested by the regular police officers, with the assistance of the special officer, 13 for affray or fighting, five for disturbing the peace, 12 for drunk and disorderly, one for interfering with a police officer, one for assault and battery, one for aggravated assault on a police officer, one for attempted rape and aggravated assault, one for aggravated assault on a police officer and carrying a concealed weapon, one for affray and drunk and disorderly, one for impersonating a police officer and carrying a concealed weapon, making a total of 37, all told, a hundred and forty-one. * * *

"Q. Now, do the police records show anything with reference to any arrests in the immediate vicinity, do you have any records of that, during that period of time, or during the early part of this year, or any period in con-

nection with this application? A. I have arrest records made in the same block, that is, the 2000 block of South Ervay, from a period the first of January, 1957 through April 25, '57; I have a total here of 76.

"Q. Now, what type of offenses were involved there? A. 62 were for drunk and disorderly, two drunk and disorderly, aggravated, one drunk and disorderly, resisting arrest, five disturbing the peace, one indecent conduct, one destruction of private property, two investigation of burglary and theft and two juvenile delinquency, or loitering in the 2000 block of South Ervay, a total of 76.

"Q. From these public records before you, is it your opinion that this place attracts police characters, people who are known law violators? A. It is my opinion that this place not only attracts well-known police characters, or criminals, it also attracts that element of people that are violators of the law as far as breaches of the peace are concerned, such as fighting and drunk and disorderly and so forth."

Sam F. Tuck, then a patrolman, now a detective in the Burglary and Theft Division of the Dallas Police Department, testified as follows:

"A. * * * I knew Mr. Stevens.

"Q. Did he cooperate with the Police Department? A. Not with me.

"Q. Well, what did he do; just tell the jury why he didn't cooperate? A. Why he didn't I do not know, but I could go in that place and ask for someone and they would tell me that he was not there. Several instances, I found out later, that the people were there that I was looking for. * * * I went in the place one night, as I would do every night when I was working out there, if I could possibly get time, and when I went in there was a spotlight on me, and they had a large reflecting chandelier there that revolved—that spotlight was kept on it all of the time and caused the light all over the building, but this particular time I was talking about, when I went in this light was thrown on me and I heard Steve on the loud speaker—

"Q. Just a moment—are you referring to the— A. I am referring to the gentleman with glasses.

"Q. Mr. Stevens, here? * * * A. Yes, sir, and he was talking over the loud speaker, and he stopped the music and he was keeping his light on me, and he told the customers or patrons of this place that they had a special officer in there and that they saw no reason for me to come in there, that I was coming in there trying to run this place. Now, this went on for two or three different nights in a row * * *."

Carl F. Hanson, Chief of Police of the City of Dallas, testified as follows:

"Q. What kind of a reputation does the Roundup Club have? A. Reflected by our records, the reputation is not good.

"Q. What do you mean by not good, I mean what led you to that conclusion? A. Well, any place that requires the amount of police attention that the Roundup Club requires and has received by the Dallas Department, in my opinion does not have a good reputation. * * *

"Q. In your opinion, does this have probably the worst record in the City of Dallas? A. Our record reflects that, yes, sir.

"Q. And upon that you reached the conclusion that the dance hall application should be denied? A. Yes, sir."

### Opinion.

Appellant City in its first six points on appeal asserts that the court erred (1) in not granting appellant's motion for instructed verdict; (2) in submitting the question of arbitrary and capricious action to the jury because (a) the granting of a permit rested with the sole discretion of the City Council, and it was justified in refusing the permit, (b) the action of the Council was supported by substantial evidence, and (c) the operation of a public dance hall is not a property right, but is a privilege subject to the control and exercise of the police power of the City; (3) in holding as a matter of law that the City Council acted arbitrarily and capriciously; (4) in permitting appellees to have a trial de novo on the question of arbitrary and capricious action and in substituting the court's opinion for that of the Council; (5) in overruling appellant's objections to the charge; and (6) in holding as a matter of law that appellees were entitled to an injunction.

■ It is well established that in cases such as this involving an appeal to a court from an order of an administrative agency, the court in reaching its decision is bound by the substantial evidence rule. Fuller v. Mitchell, Tex.Civ.App., 269 S.W.2d 517.

The meaning of the substantial evidence rule and its proper application have been subjects of much discussion and conflicting views, even in the opinions of our Supreme Court. However these conflicts have been resolved and a guiding standard set in Trapp v. Shell Oil Co., 145 Tex. 323, 198 S.W.2d 424, and Thomas v. Stanolind Oil & Gas Co., 145 Tex. 270, 198 S.W.2d 420, both cases decided by our Supreme Court May 15, 1946, with Chief Justice Alexander dissenting in both cases.

We quote from the Trapp case, 198 S.W. 2d on page 441, which in turn quotes from Railroad Commission v. Shell Oil Co., 139 Tex. 66, 161 S.W.2d 1022, 1030: *"The court* is not to substitute its discretion for that committed to the agency * * *, *but is to sustain the agency if it is reasonably supported by substantial evidence before the court."* (Emphasis ours.)

We quote also from the Thomas case [145 Tex. 270, 198 S.W.2d 421]: "A proceeding of this nature is not comparable to a proceeding in an ordinary civil suit in which the fact findings of the jury are attacked on the ground of the insufficiency of the evidence to sustain them. In that proceeding trial courts and courts of civil appeals are clothed with the authority, not possessed by this court, to set aside such findings if they are thought to be against the great weight and overwhelming preponderance of the evidence. But those courts are not clothed with authority to set aside fact findings of an administrative agency made within the scope of its statutory powers on that ground. The Legislature has clothed administrative agencies with special powers to perform special functions and *in reviewing fact findings of such agencies no question of the preponderance of the evidence is involved. The question is whether or not there is any substantial evidence affording reasonable support for such findings and the orders entered thereunder.* That is a question of law of which this court, along with the lower courts, has jurisdiction and in the exercise of that jurisdiction we consider the record before us." (Emphasis ours.)

■ Applying the law as pronounced by our Supreme Court in the two cases above quoted, we are of the opinion that as a matter of law there was substantial evidence introduced in the trial court which substantial evidence reasonably supported the action of the Council in refusing to renew appellees' dance hall permit. Appellant's first six points on appeal are sustained.

Appellant briefs seven other points on appeal. These seven points allege procedural errors in the trial. As our holdings as to the first six points are decisive

of the appeal and require a rendition of judgment for appellant, we shall not pass on the alleged procedural questions raised in the other points.

We see no merit in the contention of appellees that the City ordinances involved in this case are invalid and unconstitutional. It is well established that a city such as the City of Dallas, which operates under a home rule charter, has a right to regulate public dance halls. Art. 1175, subds. 22 and 23, V.A.C.S.; Bounty Ballroom v. Bain, Tex.Civ.App., 211 S.W.2d 248. A license to operate a public dance hall does not constitute a property right. 27 Tex.Jur. 863, 864.

Ordinance No. 3693 in question gives the Chief of Police discretionary power to grant or refuse dance hall permits. But his decision is not final. An applicant may appeal within ten days to the City Council. The Council must grant the applicant a hearing within thirty days (as was done in this case) and may in the discretionary exercise of its police powers grant or refuse the permit regardless of the previous action of the Chief of Police. Ordinance No. 6906 provides that the City Manager shall submit recommendations to the Council, which shall call a public hearing and thereafter either grant or refuse the permit. Following the Council's action, the applicant has the right as a matter of law to appeal to the courts, where he has the burden, under the substantial evidence rule, to show that the action of the Council was arbitrary and capricious. Ordinances and regulations applying similar procedures have been declared valid. City of San Antonia v. Zogheib, Tex.Com. App., 101 S.W.2d 539; Bungalow Amusement Co. v. City of Seattle, 148 Wash. 485, 269 P. 1043, 60 A.L.R. 180.

Appellees say that the evidence of arrests at the Roundup Club was inadmissible and ought not to have been considered by the court; and that even evidence of convictions following arrests would have been inadmissible, citing Pittman v. Stephens, Tex.Civ.App. 153 S.W.2d 314; Smith v. White, Tex.Civ.App., 216 S.W.2d 672; Flener v. City of Dallas, Tex.Civ.App., 272 S.W.2d 643.

We do not disagree with the holdings in the cited cases, but the holdings there are not applicable here. In each of the above cited cases the person arrested, or convicted was defending himself in a subsequent civil action. It was held that his arrest, or even his conviction was not admissible to prove that he committed the acts with which he was later charged in the civil action. The party having the burden of proof was required to prove by other means than the party's arrest and conviction that he had committed the acts in question.

We have no such situation here. None of the arrested persons is a party to this suit. If any one or more of them were parties here, and the City were suing them for their alleged acts of misconduct, they perhaps would be able to assert the defense now sought to be raised by appellees. But the guilt of the arrested persons is not an issue before us. The issue here is whether the Roundup Club, considering its character, reputation, manner of operation, and activities ought to be allowed the privilege of running a dance hall—whether such activities would be detrimental to the health, morals, and welfare of the public. And the City Council, in deciding to grant or withhold the permit, did not abuse its discretion, nor did the court err, in taking into consideration the record of the Police Department showing as a fact the number and nature of the arrests, and showing also as a fact that in the matter of arrests the Roundup Club has probably the worst record in the City of Dallas.

Appellees' counterpoints are overruled.

The judgment of the trial court is reversed and judgment is here rendered dissolving the restraining order and refusing the injunction prayed for by appellees.