HUDSON CIRCLE SERVICENTER, INC., A CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF-APPEL-LANT-CROSS-RESPONDENT, v. TOWN OF KEARNY, A MUNICIPAL CORPORATION OF NEW JERSEY, DE-FENDANT-RESPONDENT-CROSS-APPELLANT.

Argued October 20, 1975—Decided May 26, 1976.

*Mr. S. M. Chris Franzblau* argued the cause for appellant-cross-respondent (*Messrs. Franzblau, Cohen and Falkin,* attorneys; *Mr. Franzblau,* of counsel and on the brief).

*Mr. Norman A. Doyle, Jr.* argued the cause for respondent-cross-appellant.

The opinion of the Court was delivered by

PASHMAN, J. Plaintiff Hudson Circle Servicenter, Inc. instituted this action in lieu of prerogative writ to challenge an ordinance which was enacted by the Town of Kearny to regulate parking lots operated in conjunction with "truck stops."[1]

The ordinance at the time of trial provided:

### Section 1

1. The owner or operator of any public parking lot in the Town of Kearny used in conjunction with facilities catering principally

---

[1] The ordinance was originally enacted on September 9, 1970. It was amended on February 24, 1971 by the addition of a severability clause, a revised definition of "truck stops" and a limitation in its coverage to those parking facilities with a capacity in excess of 30 rather than 25 vehicles.

Because of these changes, only the facility located on plaintiff's property is presently subject to the ordinance. While there is one other facility in Kearny which is similar to plaintiff's operation, that facility, Turnpike Esso, has a parking capacity of less than 30 vehicles and therefore is not subject to these regulations.

Although there are other tractor trailer facilities located in Kearny, including terminals owned or operated by Sea-Land, Fruehauf, Yale, Acme Stores and Finast Foods, none is subject to the ordinance because they are freight terminals or distribution centers and not "truck stops" within the meaning of the ordinance.

to truck traffic and known as 'truck stops', with a parking capacity in excess of 30 vehicles shall:

a. Enclose said parking lot with a fence of a minimum height of 7 feet;

b. Provide a supervised entrance and exit thereon with sufficient lighting to illuminate the entire parking area;

c. Provide a uniformed security guard who shall be in attendance at the parking lot at all times;

d. Pave and line said parking lot for parking purposes;

e. Maintain a registration system thereon which shall be made available to the police and fire departments of the Town of Kearny and which shall provide therein the following information:

1. Daily record of all motor vehicles parking in the area with registration and description of all motor vehicles;

2. Driver license number, state and name of the operators of said vehicles with time of entry and departure.

### Section 2

Definition: *Truck Stops* — Those facilities used by carriers primarily for temporary parking of trucks during transit, provided however that such definition shall not apply to service stations or diners.

In addition, Section 3 of the ordinance prohibited the operation of any public parking lot (as defined therein) which is not in conformity with the requirements of Section 1.[2] Section 4 provided for a $50 fine for the first offense and a $100 fine or 30 days in the county jail or both for each subsequent offense. Section 4A contained a severability clause and Section 5 provided that the ordinance should take effect immediately, although the parties agreed that pending the final outcome of this litigation, the town would not attempt to enforce the ordinance.

In a letter opinion dated April 14, 1972, the trial judge sustained the ordinance in all respects, except: (1) Section 1(b) was invalidated because it lacked sufficient standards and was "not definite enough to show what it intends to require or

---

[2]After the trial but prior to the court's decision, Kearny again amended its ordinance, by deleting the word "public" from Sections 1 and 3 in order to obviate plaintiff's contention that its lot was not a "public parking lot" but was only for the private use of its tenants and subtenants.

prohibit"; (2) Section 1(c) was invalidated on the basis of our decision in *Goldberg v. Housing Authority of Newark,* 38 *N. J.* 578 (1962); (3) the paving requirement in Section 1(d) was deemed to be too costly and unreasonable, and (4) the lining requirement in Section 1(d), though found to be reasonable, was invalidated for lack of definite standards.

· Both parties appealed. While the matter was pending unheard in the Appellate Division, the town again amended its ordinance and with consent of the parties the case was remanded to the trial court.[3]

On remand, the court held that the amendments did not warrant a different ruling from that which previously concerned the owner's obligation to furnish a uniformed guard. However, the revised definitions of "sufficient lighting" and "line" were considered definite enough to overcome the deficiencies of vagueness and indefiniteness which had characterized those provisions.

The Appellate Division affirmed in an unreported opinion and we granted plaintiff's petition for certification and Kearny's cross-petition for certification. 68 *N. J.* 140 (1975).

---

[3]The amendatory provisions included the following:
SECTION 2. *DEFINITIONS*

\*       \*       \*ⁿ       \*ⁿ       \*       \*       \*       \*

(b) *SUFFICIENT LIGHTING*: Shall mean
   (1) For general lot area, one (1) minimum, average, maintained horizontal footcandle.
   (2) For entrances, exits and loading zones, two (2) minimum average, horizontal footcandles.
   (3) For Pump Service areas, ten (10) minimum, average maintained horizontal footcandles.
(c) *A FOOTCANDLE*: Shall mean a unit of illumination equivalent to that produced by a standard candle at a distance of one (1) foot.
(d) *SUPERVISED*: Shall mean the presence of a uniformed guard at each entrance and exit at all times.
(e) *LINE*: Shall mean the visible delineation of spaces on the lot so as to provide for the systematic parking of vehicles, whereby all trucks will be parked side by side, in rows of no more than two trucks one behind the other.

Having carefully reviewed the record, we now affirm with certain modifications.

Plaintiff owns 20 acres of land in Kearny located along the Hackensack River near the Junction of U.S. No. 1 (Lincoln Highway) and Hackensack Avenue. This tract is adjacent to the approach to the Hackensack Bridge which spans the Hackensack River to Jersey City. The land is also divided from east to west by a strip of land known as the Scout Avenue Connector.

Plaintiff leases the tract to a firm known as Jersey Truck Center[4] which operates a truck facility on the premises (hereinafter "the Center"). The Center contains an office building, a truck scale, a truck washing operation, a lubritorium, a repair shop for minor repairs, a barbershop, a coffee room, a clothing store, a restaurant and a filling station with both gasoline and diesel fuel pumps. These facilities, almost all of which are located to the south of the Scout Avenue Connector, are open to the public. This area and the operations conducted thereon are not affected by the ordinance.

The remainder of plaintiff's land, which consists of 10 or 11 acres located north of the Scout Avenue Connector, is utilized by Jersey Truck Center as a parking lot. It is this area which is subject to the provisions of the ordinance. Unlike the other services which are provided at the Center, the parking lot is not a public facility — a fact which is announced by a sign at its entrance. Instead, the lot is intended for the exclusive use of approximately 30 national trucking firms who are subtenants of Jersey Truck Center and who are provided office accommodations in the main building. Each subtenant has the right to park its tractor trailers on the lot and use the other facilities at the Center. The purpose of this arrangement is to provide these trucking companies with

---

[4]Throughout the proceedings the Center was alternately referred to as Jersey City Truck Center, Jersey Truck Center and "The Center."

an auxiliary office in the New York Metropolitan area. From this location, they can arrange return loads, reroute vehicles while in transit, periodically service their equipment and provide a temporary haven for their truck drivers.

There are no facilities for overnight lodging at the Center. Ordinarily, when a truck driver uses the Center as a stopping-point, he will sleep at a nearby motel. However, drivers do occasionally stay at the Center overnight by sleeping in the lodging compartments of their truck cabs.

The lot itself, which provides parking space for approximately 200 tractor trailers, is unpaved and becomes muddy when soaked by rain. As a result, it is rutted from the constant passage of heavy trucks. For these reasons, it is difficult to establish and maintain a clear parking scheme by means of lines or markers, despite the efforts of Jersey Truck Center to do so. Although the lot does not have a fence, railroad ties have been used to delineate its perimeter. The only means of gaining vehicular access to the lot is to turn from Hackensack Avenue onto the Scout Avenue Connector and from there onto a dirt path which enters the lot. No parking fees are collected at the entrance and no attendants are on duty there. Consequently, access to and egress from the lot is unsupervised.

Defendant municipality contends that its ordinance is a justified response to problems which the town has incurred from plaintiff's operation. As proof of its contention, the municipality presented the original record books of the Kearny Police and Fire Departments. These books list all the reported incidents allegedly occurring on or near the Center's parking lot between June 18, 1968 and December 25, 1971.[5] Because the town stipulated that there was no wrongdoing

---

[5] Although the incidents reported between September 9, 1970 and December 25, 1971 occurred after the ordinance was adopted, they are still probative in this matter since the town agreed not to enforce the ordinance until after final disposition of this case. In addition, there is no evidence that plaintiff has voluntarily complied with any provisions of the ordinance.

directly attributable to plaintiff, the evidence concerning these incidents was introduced solely to illustrate the problems encountered by law enforcement officials in the area. It was not proffered to establish criminal responsibility for the incidents themselves. We have reviewed these records and find that they report substantial illegal activity in this area during the relevant time period.

Specifically, there were at least 34 reports of trailers or tractor trailer combinations having been stolen from the lot. Many of these units were also loaded with merchandise. A large number of the thefts occurred while the vehicles were parked in the lot for a weekend or overnight.

During the same time period, there were 11 reported thefts from tractors or trailers parked in the lot. In addition, there were 25 reports from Center subtenants that tires, tire rims, doors, license plates and other equipment had been removed from their trucks. Apparently, only three arrests resulted from all these various reports.

Also during this period, eight tractor trailers which had been hijacked elsewhere were abandoned on the lot. Four other stolen vehicles were discovered outside the parking area but within its immediate vicinity. Six collisions in the lot were reported during this period, but on at least two of these occasions the responsible individual departed without identifying himself. Police records also reveal that five major altercations either occurred in the parking area or involved trucking personnel outside of the lot. In addition, there were approximately 18 accidental injuries to truck drivers who were using the facility.

Several armed robberies also occurred on the premises. On one occasion a truck driver was accosted and robbed while he was walking through the lot. At another time, a driver was robbed as he sat in the cab of his own truck. At least three additional armed robberies were reported. On three separate occasions, adolescent runaways, both male and female, were found at the Center and, on another date, a fugitive from justice was apprehended there.

Women were arrested on charges of prostitution or for being present at the lot without giving a good account of themselves on 16 different occasions. Several were observed soliciting from truck to truck. At least three of these women possessed narcotics or narcotics paraphernalia at the time of their arrests. In conjunction with these charges, one male was arrested for transporting women for purposes of prostitution and a report was filed with the police that truck drivers were being annoyed by pimps.

The Fire Department records indicate that fire apparatus responded to approximately 18 rubbish fires at or near the lot during this period. In addition, one reported fire of suspicious origin caused extensive damage to a tractor trailer. The frequency and serious nature of these reported incidents are clearly probative of the problems associated with this area. The reports also reflect the extent to which the police responded to these problems.

I. *The Police Power — Does the Municipality have the Power to Enact the Ordinance?*

While there is no State enabling act which specifically authorizes a municipality to adopt an ordinance regulating parking lots such as that at the Center, ample authority for such an enactment may be found in the general police powers which are vested in municipalities.

*N. J. S. A.* 40:48–1 contains an extensive list of matters on which municipalities are specifically empowered to enact legislation. *N. J. S. A.* 40:48–2 provides generally:

Any municipality may make, amend, repeal and enforce such other ordinances, regulations, rules and by-laws not contrary to the laws of this state or of the United States, as it may deem necessary and proper for the good government, order and protection of persons and property, and for the preservation of the public health, safety and welfare of the municipality and its inhabitants, and as may be necessary to carry into effect the powers and duties conferred and imposed by this subtitle, or by any law.

This second provision has been construed as an express delegation of State police powers to local governing bodies. This power is "in addition, rather than merely ancillary, to the sundry detailed authorizations for municipal action contained in our statutes." *N. J. Builders Ass'n v. Mayor, E. Brunswick Tp.*, 60 *N. J.* 222, 227 (1972); *Summer v. Teaneck,* 53 *N. J.* 548, 552 (1969); *Fred v. Borough of Old Tappan,* 10 *N. J.* 515, 520–521 (1952). Additional force attaches to this general delegation of power by the constitutional directive that "any law concerning municipal corporations formed for local government . . . shall be liberally construed in their favor." *N. J. Const.* (1947), Art. IV, § VII, par. 11. Furthermore, the Town of Kearny, which is subject to the Optional Municipal Charter Law (Faulkner Act), has been provided with other powers which are codified as *N. J. S. A.* 40:69A–1, *et seq.*:

The general grant of municipal power contained in this article is intended to confer the greatest power of local self-government consistent with the Constitution of this State. Any specific enumeration of municipal powers contained in this act or in any other general law shall not be construed in any way to limit the general description of power contained in this article, and any such specifically enumerated municipal powers shall be construed as in addition and supplementary to the powers conferred in general terms by this article. All grants of municipal power to municipalities governed by an optional plan under this act, whether in the form of specific enumeration or general terms, shall be liberally construed, as required by the Constitution of this State, in favor of the municipality. [*N. J. S. A.* 40:69A–30]

Ordinances, as well as statutes, are accorded a presumption of validity. *Hutton Park Gardens v. West Orange Town Council,* 68 *N. J.* 543, 564 (1975); *Collingswood v. Ringgold,* 66 *N. J.* 350, 358 (1975). The presumption is not irrebutable but it imposes a burden on the party seeking to overturn the ordinance. *Hutton Park Gardens v. West Orange Town Council, supra,* 68 *N. J.* at 564; *Collingswood v. Ringgold, supra,* 66 *N. J.* at 358; *Moyant v. Paramus,* 30 *N. J.* 528, 535 (1959). The presumption may be overcome

only by a clear showing that the local ordinance is arbitrary or unreasonable. *Vickers v. Gloucester Tp. Com.,* 37 *N. J.* 232, 242 (1962), *cert.* denied 371 *U. S.* 233, 83 *S. Ct.* 326, 9 *L. Ed.* 2d 495 (1963); *Kozesnik v. Montgomery Tp.,* 24 *N. J.* 154, 167 (1957); *Local Bd. of Health, Berkeley Tp. v. Johnson,* 73 *N. J. Super.* 384, 391–392 (App. Div. 1962).

A review of the cases which have construed the police power statutes leads us to conclude that attempts by defendant to regulate plaintiff's parking facility clearly fall within the purview of the municipal police power. In *Garden State Racing Ass'n v. Cherry Hill Tp.,* 42 *N. J.* 454 (1964), for example, this ·Court sustained an ordinance which regulated a parking lot operated in conjunction with a privately owned race track. Although the principal issue in that case concerned the propriety of certain licensing fees, the Court observed: "There is no question that a municipality could regulate parking lots under the general police power enactment, *R. S.* 40:48–2." 42 *N. J.* at 461. There, as here, the parking area which the municipality sought to regulate was a privately owned business.[6]

---

[6]For cases construing the scope of the municipal police power generally, see also *Collingswood v. Ringgold, supra,* 66 *N. J.* 350 (ordinance requiring registration of canvassers and solicitors); *Senta v. Mayor and Council of Clifton,* 66 *N. J.* 204, 216–17 (1974) and cases cited (dissenting opinion) (ordinance requiring minimum floor space in residential housing) ; *Inganamort v. Borough of Fort Lee,* 62 *N. J.* 521 (1973) aff'g 120 *N. J. Super.* 286 (Law Div. 1972) (an ordinance regulating rents) ; *N. J. Builders Ass'n v. Mayor, E. Brunswick Tp., supra,* 60 *N. J.* 222 (ordinance licensing building contractors) ; *State v. Boston Juvenile Shoes,* 60 *N. J.* 249 (1972) (ordinance regulating the size and placement of signs); *Summer v. Teaneck, supra,* 53 *N. J.* 548 (ordinance designed to prevent "blockbusting") ; *Mogolefsky v. Schoem,* 50 *N. J.* 588 (1967) (ordinance licensing real estate brokers who make personal solicitations) ; *Moyant v. Paramus, supra,* 30 *N. J.* 528 (ordinance regulating and licensing solicitors and canvassers) ; *Kennedy v. City of Newark,* 29 *N. J.* 178 (1959) (ordinance requiring city employees to be residents of the city) ; *Adams Newark Theatre Co. v. City of Newark,* 22 *N. J.* 472 (1956), aff'd 354 *U. S.* 931, 77 *S. Ct.* 1395, 1 *L. Ed.* 2d 1533 (1957) (an ordinance prohibiting

In addition to these police power provisions, other statutes may provide a more specific legislative basis for regulating individual aspects of plaintiff's operation. For example, *N. J. S. A.* 39:4–197 permits municipalities to regulate entrances and exits of public parking places. *N. J. S. A.* 40:48–2.46 enlarges this power by authorizing requirements "for placement and types of lighting and . . . [for] installation and maintenance of internal traffic directional lines." Similarly, a specific statutory basis for the fencing provisions of the Kearny ordinance may be found in *N. J. S. A.* 40:67–1(e) which empowers local governments to:

> Cause the owners of real estate abutting on any street or highway to erect fences, walls, or other safeguards for the protection of persons from injury from unsafe places on said real estate adjacent to or near such street or highway . . .[7]

nudity in shows and exhibitions) ; *Fred v. Borough of Old Tappan, supra,* 10 *N. J.* at 519–520 and cases cited therein (ordinance regulating removal of soil from within the municipality) ; *Garneau v. Eggers,* 113 *N. J. L.* 245 (Sup. Ct. 1934) (ordinance restricting traffic on certain highways to noncommercial vehicles) ; *Apt. House Council v. Mayor & Coun., Ridgefield,* 123 *N. J. Super.* 87 (Law Div. 1973), aff'd o.b., 128 *N. J. Super.* 192 (App. Div. 1975) (an ordinance requiring multiple dwelling owners to post security for emergency repairs) ; *Gold v. Trenton City Coun.,* 121 *N. J. Super.* 137 (App. Div. 1972) (ordinance requiring certain packaged foods to have transparent packaging) ; *Silco Automatic Vending Co. v. Puma,* 108 *N. J. Super.* 427 (App. Div. 1970) (an ordinance regulating the placement of juke boxes) ; *see generally* 7 *McQuillin, Municipal Corporations* (3 ed. 1968), §§ 24.648, 24.652–24.657.

[7] We also take note of *N. J. S. A.* 40:67–1(f) which permits municipalities to control the erection and maintenance of all fencing which fronts on municipal streets, highways or alleys; *N. J. S. A.* 40:48–1(29) which more specifically empowers localities to regulate the size, height and dimensions of fences and finally *N. J. S. A.* 40:52–1(a) which permits municipalities to license and regulate "all vehicles used for the transportation of passengers, baggage, merchandise, and goods . . . and the owners and drivers of all such vehicles."

Application of these statutory provisions to the instant case raises several interesting questions. For instance, are the statutes which deal with fencing intended to safeguard the public from unsafe activities on the land or just from unsafe places on the land, such

Although application of the above statutes to the case at bar may present interesting questions of law, *see* note 7 *supra*, it is unnecessary for us to resolve them. We hold that· the Kearny ordinance is amply supported by the municipal police power expressly delegated to the town in *N. J. S. A.* 40 :48–2.

II. *Due Process — Does the Ordinance Bear a Real and Substantial Relationship to a Legitimate Governmental Purpose? Is it Sufficiently Clear and Definite?*

It is axiomatic that no·exercise of the police power may be so arbitrary or unreasonable as to violate standards of due process of law. This means that municipal enactments may not transcend public need and must bear a real and substantial relationship to the objective of the ordinance. *Hutton Park Gardens v. West Orange Town Council, supra,* 68 *N. J.* at 560, 562–63 ; *Moyant v. Paramus, supra,* 30 *N. J.* at 544 ; *Roselle v. Wright,* 21 *N. J.* 400, 409–410 (1956) ; *see* 7 *Mc-Quillin, supra,* § 24.642 at 744 and § 24.653 at 762 concerning regulation of parking lots in general. Furthermore, such enactments may not be so vague and indefinite that persons of ordinary intelligence are unable to discern what the ordinance prohibits, requires or punishes. *N. J. Builders Ass'n v. Mayor, E. Brunswick Tp., supra,* 60 *N. J.* at 231, 232–34 ;

---

as potholes? Does the power to regulate fences which front on a public highway include the power to require the erection of fences which fully enclose a privately owned lot? Is plaintiff's facility "open to the public" within the meaning of *N. J. S. A.* 39 :4–197 and 40 :48–2.46? With regard to this last proposition, it might be noted that a recent line of cases holds that certain privately owned parking lots are quasi-public in nature and therefore subject to the provisions of the Motor Vehicle Act, *N. J. S. A.* 39 :4–1 *et seq. See Brown v. Mortimer,* 100 *N. J. Super.* 395, 405 (App. Div. 1968) (department store parking lot) ; *State v. Gillespie,* 100 *N. J. Super.* 71, 75 (App. Div. 1968), certif. denied 51 *N. J.* 274 (1968) (apartment house garage open to visitors and tradesmen as well as tenants) ; *State v. Sisti,* 62 *N. J. Super.* 84 (App. Div. 1960) (shopping center parking area). Query whether the principle set down in these cases should apply to privately owned facilities which, while serving a considerable amount of traffic, are open only to their tenants and not to the public at large?

*Weiner v. Borough of Stratford,* 15 *N. J.* 295, 299 (1954); *Ward v. Scott,* 11 *N. J.* 117, 123–25 (1952); *cf. Camarco v. Orange,* 116 *N. J. Super.* 531, 534 (App. Div. 1971), aff'd, 61 *N. J.* 463 (1972); *Howell Tp. v. Sagorodny,* 46 *N. J. Super.* 182, 187 (App. Div. 1957), aff'd o. b., 25 *N. J.* 502 (1958); *Hoboken v. Bauer,* 137 *N. J. L.* 327, 329 (Sup. Ct. 1948); *Silco Automatic Vending Co. v. Puma, supra,* 108 *N. J. Super.* at 431–32; *State v. Caez,* 81 *N. J. Super.* 315, 319 (App. Div. 1963); 7 *McQuillin, supra,* § 24.642 at 744 and § 24.653 at 762. We will examine each provision of the Kearny ordinance in light of these principles.

A. *The requirement that the lot be enclosed by a fence (Section 1(a)).*

■ We find this provision to be valid in its entirety.

Several of the statutory provisions previously noted, such as *N. J. S. A.* 40:48–1(27), 40:67–1(e) and 40:67–1(f), are demonstrative of the considerable power that municipalities possess regarding the erection and maintenance of fences. They further indicate that municipal ordinances requiring the construction of fencing are consistent with both State policy and legislative strictures.

Numerous cases in this and other jurisdictions have held fencing requirements similar to that in the Kearny ordinance to be valid exercises of the police power because of the reasonable relationship such requirements bear to a legitimate municipal purpose. *Chaiet v. East Orange,* 136 *N. J. L.* 375, 379 (Sup. Ct. 1947) (open air used car lots); *Ring v. North Arlington,* 136 *N. J. L.* 494 (Sup. Ct. 1948), aff'd o. b., 1 *N. J.* 24 (1948) (same); *Mason v. Hillsdale Borough,* 53 *N. J. Super.* 500 (Law Div. 1959) (swimming pools); *Lenci v. Seattle,* 63 *Wash.* 2d 664, 388 *P.* 2d 926 (Sup. Ct. 1964) (auto wrecking yards); *Gear v. Phoenix,* 93 *Ariz.* 260, 379 *P.* 2d 972 (Sup. Ct. 1963) (parking lots used by three or more vehicles); *Vermont Salvage Corp. v. Village of St. Johnsbury,* 113 *Vt.* 341, 34 *A.* 2d 188, 193 (Sup. Ct. 1943)

(junk yards); *City of Shreveport v. Brock,* 230 *La.* 651, 89 *So.* 2d 156 (Sup. Ct. 1956) (junk yards); *People v. Sevel,* 120 *Cal. App.* 2d *Supp.* 907, 261 *P.* 2d 359 (App. Dep't. 1953) (auto junk yards).[8] Even in *Steiker v. East Paterson,* 137 *N. J. L.* 653, 656 (E. & A. 1948), which invalidated an ordinance requiring the construction of a four to six foot high fence, the court recognized that the municipality had the power to require construction of fences with *reasonable* height restrictions, though the requirement in that case was deemed to be unreasonable.

Within the factual setting of this case, Kearny's fencing requirement bears a real and substantial relationship to the municipal purpose of minimizing crime. A fence will discourage persons intending to engage in criminal activity, dump rubbish or abandon stolen vehicles from entering the lot. It will also tend to prevent unauthorized persons in general and thieves in particular from gaining access to the Center. The height restriction for the fencing bears a reasonable relationship to the purpose of the ordinance by requiring that the fence be high enough to dissuade those who would attempt to scale it.

B. *The requirement that there be a supervised entrance and exit with sufficient lighting (Section 1(b)).*

This requirement also bears a real, substantial and obvious relationship to the goals of the ordinance. Lighting the parking area will discourage and minimize criminal activities. According to Kearny's Chief of Police, it will also

---

[8]In one case which concerned the regulation of junk yards, the court assumed, *without deciding,* that a fencing requirement similar to that in the instant case was invalid. *Howell Tp. v. Sagorodny, supra,* 46 *N. J. Super.* 182. In that decision, however, the court relied upon cases which either invalidated requirements that were plainly unreasonable or dealt with the issue of municipal regulation for purely aesthetic purposes. Hence, we find this case to be inapposite.

facilitate law enforcement efforts by increasing visibility and assisting the detection of criminal activities being conducted on the premises. Furthermore, the illumination would be helpful to fire fighting and other emergency units responding to calls for assistance at the parking lot.

Plaintiff has presented no proofs which contradict these observations. Moreover, nothing in the record convinces us that the lighting requirement is arbitrary or unreasonable, that its cost is prohibitive or that compliance with this provision is otherwise impossible. Therefore, plaintiff has failed to prove that this requirement transgresses the limits of due process.

At trial, however, the judge did find this provision to be vague and indefinite. Specifically, the judge asked:

> If the operator of the lot were to be charged with a violation of the ordinance for failing to provide "sufficient lighting," what test would be employed by the municipal judge to determine whether the lighting was sufficient? . . . . How much or how little illumination must there be to satisfy the requirement that the lighting be "sufficient"?

The town has since amended the ordinance to include precise standards for determining the sufficiency of the lighting.[9] By so doing, the town has satisfactorily remedied this deficiency. Moreover, we cannot say that the standards themselves are unreasonable. *Compare, e. g., N. J. A. C.* 6:22–14.6 (installed lighting intensity tables for public school facilities); *N. J. A. C.* 5:10–9.4, 6.7 (regulations for multiple dwellings); *N. J. A. C.* 16:26–3.5 (highway safety lighting). If the amount of lighting is sufficient, the exact placement and construction of the lights is left to the discretion of the owner.[10]

---

[9]*See* note 3 *supra.*

[10]Section 1(b) of the ordinance also contains a clause requiring the parking lot proprietor to provide a *supervised* entrance and exit. As amended, the ordinance defines "supervised" as "the

C. *The requirement that there be a uniformed guard in attendance at the lot at all times (Section 1(c); Sections 1(b) and 2(d)).*

█ Both the trial court and the Appellate Division relied upon our decision in *Goldberg v. Housing Authority of Newark,* 38 *N. J.* 578 (1962) to invalidate that portion of the ordinance which requires the presence of a uniformed guard at the lot at all times. In *Goldberg,* the plaintiff was a milkman who was beaten and robbed by two men in a self-service passenger elevator while he was delivering milk to defendant's public housing project. Plaintiff grounded his action for damages on defendant's breach of duty to provide police protection. *Id.,* 38 *N. J.* at 580 n. 1. This Court reversed a jury verdict for plaintiff and held that "the duty to provide police protection is and should remain the duty of government and not of the owner of a housing project." 38 *N. J.* at 592. Because *Goldberg* was decided by a 4 to 3 vote, it has been suggested that we reconsider the viability of that decision. Since we find *Goldberg* to be clearly distinguishable from the instant case, we decline to undertake this inquiry.

*Goldberg* was a negligence case which considered the liability of defendant for failure to provide adequate police protection to plaintiff. It did not concern the validity of a municipal ordinance enacted under the police power. Specifically, the Court in *Goldberg* considered the issue of whether *the Court should impose* a common law duty upon owners of multi-family housing to provide police protection for tenants, their guests and their business invitees. Former Chief Justice Weintraub, speaking for the Court, observed:

> The question is not simply whether a criminal event is foreseeable, but whether a *duty* exists to take measures to guard against it. Whether a *duty* exists is ultimately a question of fairness . . .

---

presence of a uniformed guard." Since this requirement, as currently defined, is indistinguishable from the requirements of Section 1(c), we will discuss them together.

█

We come then to the question of whether as an original proposition the owner of multi-family structures should have the duty to provide police protection. As we have said, the question is one of fairness in the light of the nature of the relationship, the nature of the hazard, and the impact of such a duty on the public interest. [38 *N. J.* at 583, 588; emphasis in original]

The cases cited and reviewed by both the majority and dissenting opinions in *Goldberg* were all negligence cases dealing with the applicable standard of care in civil actions for damages. Thus, nothing in *Goldberg* precludes a municipality from regulating private businesses to require some form of security under appropriate circumstances. In fact, in reaching its decision in *Goldberg,* this Court carefully noted the absence of any governmental enactment which would impose such a duty on defendant:

Since the statute under which defendant was created does not impose such a duty upon it, the question is whether that obligation can be found upon principles applicable to the private owner of residential property. [38 *N. J.* at 581–82; footnote omitted]

Hence, there was no consideration in *Goldberg* of the validity of municipal police regulation requiring private businesses to furnish guards or other forms of security services, nor any implication against the validity of such regulations.

Finally, most of the underlying considerations in *Goldberg* are absent in the instant case. Unlike the ambiguous standard of care applied in *Goldberg* which requires "reasonable police protection" (38 *N. J.* at 589–90), the requirement in this case is clear, definite and justified by the nature of the problem. The cost of compliance in the instant case, unlike that in *Goldberg,* will not be imposed "upon the segment of the citizenry which is least able to bear it." 38 *N. J.* at 591. Furthermore, Kearny's ordinance does not shift the entire burden of providing police protection upon the truck

stop owner or operator.[11] *Compare Goldberg, supra,* 38 *N. J.* at 588–89.

Having distinguished *Goldberg,* we now consider the provision before us. At the outset and absent a case directly on point, we note that the municipal power to require private businesses to hire guards has been generally upheld in a variety of situations. Most analogous to the case at bar is *Garden State Racing Ass'n v. Cherry Hill Tp., supra,* 42 *N. J.* 454. There, this Court upheld a local ordinance which contained a similar provision while addressing an unrelated issue. The ordinance provided in part:

> (a) All licensees shall have a sufficient number of guards or attendants on duty to control all entrances or exits at all times during which vehicles are parked, for the purpose of limiting the improper removal of vehicles and directing the traffic flow, * * *.

Similarly, in an early New Jersey case, the former Supreme Court sustained an ordinance which compelled railroad companies to station guards at certain municipal street crossings as a valid exercise of the police power. *State, Delaware, Lackawanna & W. R. R. Co. v. East Orange,* 41 *N. J. L.* 127 (Sup. Ct. 1879).

Other jurisdictions have also sustained legislation requiring private establishments to hire guards or fire marshals as protective measures, *O'Neil v. Providence Amusement Co.,*

---

[11] We envision that had the victim of a tractor trailer hijacking brought an action for damages against the Center alleging that it had failed to satisfy its common law duty to provide police protection, *Goldberg* most certainly would have been apposite. However, that is not the situation here and we express no opinion on it.

We also distinguish *Fasino v. Mayor & Borough Coun. of Montvale,* 122 *N. J. Super.* 304 (Law Div. 1973), aff'd o.b., 129 *N. J. Super.* 461 (App. Div. 1973) from the case at bar. There, unlike in the instant case, the court found that the municipal regulation bore no substantial relationship to the protection of public health, safety or welfare. In light of the evidence presented in the instant case, the relationship of Kearny's ordinance to the public welfare is both substantial and obvious.

42 *R. I.* 479, 108 *A.* 887 (Sup. Ct. 1920) (theaters); *Bounty Ballroom v. Bain,* 211 *S. W.* 2d 248 (Tex. Civ. App. 1948) (dance halls), or, in the alternative, to permit such services to be furnished by local police or fire departments. *City of Hartford v. Parsons,* 87 *Conn.* 412, 87 *A.* 736, *Ann. Cas.* 1916A, 1182 (Sup. Ct. of Err. 1913) (theaters and opera houses); *cf. O'Neil v. Providence Amusement Co., supra.* Many jurisdictions have gone even further and permitted municipalities to exact fees from private businesses for the provision of these compulsory services. *Connecticut Theatrical Corp. v. City of New Britain,* 147 *Conn.* 546, 163 *A.* 2d 548 (Sup. Ct. of Err. 1960) (theater owners required to pay for the attendance of a police officer at each performance); *American Baseball Club of Philadelphia v. City of Philadelphia,* 312 *Pa.* 311, 167 *A.* 891 (Sup. Ct. 1933), appeal dismissed 290 *U. S.* 595, 54 *S. Ct.* 128, 78 *L. Ed.* 524 (1933) (attendance of police required at profit-making athletic events); *Chung Mee Restaurant Co. v. Healy,* 86 *N. H.* 483, 171 *A.* 263 (Sup. Ct. 1934) (public dance halls required to pay for police supervision); *Tannenbaum v. Rehm,* 152 *Ala.* 494, 44 *So.* 532, 11 *L. R. A., N. S.,* 700, 126 *Am. St. Rep.* 52 (Sup. Ct. 1907) (ordinance requiring fire chief to assign one fireman to every theater performance at the owner's expense upheld as "clearly within the police power of the municipality." 44 *So.* at 533); *see also City of New Orleans v. Hop Lee,* 104 *La.* 601, 29 *So.* 214 (Sup. Ct. 1901); *Harrison v. Mayor and Council of Baltimore,* 1 *Gill* (Md.) 264 (1843); *contra, Ex Parte Newberg,* 140 *Tex. Cr. R.* 211, 143 *S. W.* 2d 786 (Crim. App. 1940).[12]

---

[12]In *Ex Parte Newberg, supra,* an ordinance requiring dance hall owners to pay a fixed sum for police protection was invalidated because it required owners to hire special police officers of the City of Dallas at a fixed wage, rather than permitting them to employ competent guards of their own choosing. Subsequent enactments requiring dance hall operators to hire guards, but allowing them to employ private security forces have since been upheld in that

Those courts which have invalidated this type of ordinance have generally done so on finding insufficient authority for the enactment under the specific constitutional or statutory grants of police power in that jurisdiction. *Flower Valley Shopping Center v. St. Louis County*, 528 *S. W.* 2d 749 (Mo. Sup. Ct. 1975);[13] *City of Chicago v. Weber*, 246 *Ill.* 304, 92 *N. E.* 859, 34 *L. R. A.*, *N. S.*, 306, 20 *Ann. Cas.* 359 (Sup. Ct. 1910); *Waters v. Leech*, 3 *Ark.* 110 (Sup. Ct. 1840). In light of the constitutional and statutory provisions discussed in Part I of this opinion, it appears that the scope of the municipal police power in New Jersey far exceeds that

---

state. *Bounty Ballroom v. Bain, supra,* 211 *S. W.* 2d at 250; *City of Dallas v. Stevens,* 310 *S. W.* 2d 750, 756 (Tex. Civ. App. 1958).

Although the above recited precedents arose in amusement parks, theatres, dance halls or similar settings which assume a quasi-public nature compared to the plaintiff's private truck stop, the police power, as amply demonstrated earlier, may legitimately be exercised irrespective of such distinctions in the situs. Compare the requirement that an owner of a multiple dwelling with nine or more units must either have a person performing janitorial functions, reside on or near the premises himself, or provide for janitorial services on a 24-hour a day basis. *N. J. A. C.* 5:10–19.4(g).

[13]In *Flower Valley Shopping Center v. St. Louis County, supra,* an ordinance requiring shopping centers to provide outside security services was invalidated. The court explained the narrow scope of its holding:

As we view the case, the determinative question is whether St. Louis County may impose upon the owners and tenants of shopping centers the duty of providing police protection for the visiting public. In answering this question it is first necessary to distinguish the issue of the constitutionality of the ordinance, which refers to the reasonableness of the exercise of the County's police power, and the issue of authority under the County charter to enact such legislation in this area of the law. In other words, an ordinance may well meet the constitutional standard of reasonableness, and yet be invalid because a county or city has not been granted the power and authority to enact such legislation. We feel this is the situation in the present case. [528 *S. W.* 2d at 751]

The court found the ordinance to be a reasonable exercise of the police power (528 *S. W.* 2d at 751), but held that the county did not have the authority to enact it under the constitutional provisions relating to the adoption of county charters.

found applicable in the above cited cases. To the extent that these decisions rely on broader grounds, they are against the clear weight of authority.[14] *See Ventura Cty. v. So. California Edison Co.,* 85 *Cal. App.* 2d 529, 193 *P.* 2d 512, 516 (Dist. Ct. App. 1948).

With respect to Kearny's ordinance, it is clear that the clauses which require a uniformed guard at the lot are subject to the same limitations and are accorded the same presumptions as are the other sections of the ordinance. That

---

[14]In support of its conclusion, the court in *City of Chicago v. Weber, supra,* offered the following additional argument:

In every building in the city where large numbers of people are employed or where the public go in crowds, the safety of those in the building would be promoted by having a member of the fire department there, and, if the discharge of the duty to the public who attend theaters may be charged to the owner, the same requirement may be made of the owner of every other building where the public are invited or attend in numbers. The city has power to establish a fire department, to erect engine houses, and provide fire engines and other implements for the prevention and extinguishment of fires; but that duty is a duty to the public. If there is power to charge the expenses of performing that public duty to the owner of a theater, there is also power to do the same thing with respect to other owners, and the members of the fire department could be parceled out and stationed in private buildings, so that practically the whole expense of the fire department would be paid by individuals or corporations. If the city has authority to do that, it could accomplish the same result with policemen, who are in the direct exercise of the police power, and they might be stationed in every building where disorder or violation of the law might occur and the expense be charged to the owner. That the city cannot perform its duties to the public in that way is manifest. [92 *N. E.* at 861–62]

While these observations pose an interesting question, by way of response we need only note that municipal ordinances should not be struck down merely because they *might* be susceptible to abuse. In light of our factual findings disclosing the need for this ordinance and given the presumption favoring municipal enactments, it is clear that Kearny's ordinance is reasonable under the circumstances. In any event, we note that Kearny has not relinquished its public duty to provide police protection. *See* page 311, *infra.* Rather, it has merely called upon plaintiff to provide assistance in the performance of that duty, such assistance clearly justified by the amount of crime occurring in the area.

this provision bears a reasonable relationship to the purposes of the ordinance cannot be doubted.

The presence of a uniformed guard would certainly deter criminal conduct. Moreover, in accordance with instructions from his employer, the guard could prevent all unauthorized persons or vehicles from entering the lot. Finally, he could direct traffic especially on those occasions when emergency vehicles must enter the premises.

More importantly, the guard would be available to report the activities of suspicious individuals to the police and thus help avert criminal conduct. At trial, defendant's Chief of Police testified that on such occasions the guard would merely notify the police who would then bear the burden and responsibility of enforcing the law. We do not read Sections 1(b) or 1(c) of the ordinance to require that the uniformed guard undertake the duties of the police department in investigating crimes and apprehending and prosecuting criminal offenders. There is no evidence in the record which substantiates plaintiff's assertion that "Kearny is seeking to compel the formation of a private police force." Similarly, there is no evidence which suggests that the requirement is excessively burdensome or unworkable. Because plaintiff has failed to demonstrate that this provision is arbitrary or unreasonable, we reverse the judgments below and uphold the requirement that a uniformed guard be stationed at the lot at all times.[15] This is a valid exercise of the police power.

D. *The requirement that the lot be paved and lined for parking purposes (Section 1(d))*

The requirement that the parking area be paved and lined obviously bears *some* rational relationship to the purpose of

---

[15]We read the ordinance to *require* no more than one guard at any given time. However, if the owner or operator of the facility desires to employ additional guards, he may certainly do so.

the ordinance. For example, these improvements would assist the efforts of law enforcement authorities to patrol the area since they no longer would have to contend with the mud and the ruts which presently exist there. Moreover, by promoting a more orderly parking of tractor trailers, this requirement would create well defined aisles within the lot and permit easier surveillance by police officers, and easier access by fire-fighting equipment.

Nevertheless, the trial judge found the paving requirement to be unreasonable. Because there is sufficient evidence to support his conclusion, we will not disturb it. As previously noted, the Center's parking area encompasses 10 to 11 acres of land. The cost of piling and paving such a large area would be extremely high, especially since the lot would have to accommodate heavy trucks and trailers. The tidal influences and the condition of the subsurface soil at the parking lot would necessitate yearly refurbishing in order to maintain it. Finally, as the trial court observed, though a paved lot would promote the orderly parking of vehicles and facilitate patrolling the area, "that purpose could also be accomplished on an unpaved lot." Thus, the benefit of this provision is clearly outweighed by practical considerations to the contrary which are weighty enough to stamp the regulation as arbitrary. *Cf. Brunetti v. Borough of New Milford,* 68 *N. J.* 576, 599 (1975); *Kirsch Holding Co. v. Borough of Manasquan,* 59 *N. J.* 241, 251–52 (1971).

As to the lining provision, the trial court found the requirement to be reasonable and noted the efforts of Jersey Truck Center to delineate parking spaces. Nevertheless, it held that the provision was invalid for indefiniteness and should be rewritten. In this regard, we agree with the Appellate Division's conclusion that the clarified definition of "line" contained in the amended ordinance fully satisfies the deficiencies outlined by the trial court and we uphold this portion of the decision. *See* note 3 *supra.*

E. *The requirement that a registration system be maintained at the lot (Section 1(e))*

██ This provision requires that plaintiff maintain a registration system which lists relevant information including a description of each truck which enters the lot, its license number and registration, its time of entry and departure and the names of its drivers. This information must be made available to the police on request.

The purpose of the requirement is to enable both the operator of the facility and the police to know who enters and leaves the lot and who is in the vicinity of the Center on any given day. Not only will this information facilitate law enforcement efforts in general, but the requirement will also discourage thieves from hijacking trucks or abandoning stolen vehicles on the lot since it is likely that they will be asked to identify themselves. Finally, this information will assist police in determining whether drivers whom they question are legitimately in possession of the vehicles which they are driving.

Plaintiff does not challenge this requirement on the ground that it is unreasonable, indefinite or unrelated to a legitimate municipal purpose. Rather, plaintiff argues that it is invalid because the State has preempted this substantive area of law by enacting the Motor Vehicle Act, *N. J. S. A.* 39: 1–1 *et seq.* We find this contention to be without merit.

As noted above, there are no State statutes which directly regulate facilities of this kind that would evince a legislative intent to fully preempt the field, *cf. Brunetti v. Borough of New Milford, supra,* 68 *N. J.* at 601; *Inganamort v. Fort Lee, supra,* 62 *N. J.* at 537; *Ringlieb v. Parsippany-Troy Hills Tp.,* 59 *N. J.* 348 (1971); *Sutherland, Statutory Construction* (4 ed. 1973), § 30.05 at 349; nor is there any reason why the subject matter of this ordinance requires statewide uniformity. *Cf. Inganamort v. Fort Lee, supra,* 62 *N. J.* at 528–30; *Tp. of Chester v. Panicucci,* 62 *N. J.* 94, 99 (1973); *Summer v. Teaneck, supra,* 53 *N. J.* at 553;

*In re Public Service Electric & Gas Co.*, 35 *N. J.* 358, 371 (1961) ; *Wagner v. City of Newark,* 24 *N. J.* 467, 478–79 (1957).

In addition, the registration requirement itself is not in conflict with State policy or with any statute which has been brought to our attention. *See Summer v. Teaneck, supra,* 53 *N. J.* at 554; *Auto-Rite Supply Co. v. Mayor & Woodbridge Tp. Comm.,* 25 *N. J.* 188 (1957). *N. J. S. A.* 39 :4–197, which was cited by plaintiff as an express limitation on the municipal police power, is confined by its terms and its application to the field of traffic regulation. Neither the registration requirement nor the ordinance as a whole purports to concern the regulation of traffic per se. Moreover, neither *N. J. S. A.* 39 :3–29 (which requires all motorists to carry a driver's license and a registration certificate and to exhibit them upon demand by a law enforcement officer) nor *N. J. S. A.* 39 :5–1 (which declares that enforcement of the Act shall be vested in such officers) supports plaintiff's position. The Kearny ordinance was not enacted to *enforce* the Motor Vehicle Act. Its provisions do not contravene, supplant or impede that legislation. As former Chief Justice Weintraub wrote in *Kennedy v. City of Newark, supra* :

Before it can be said that the police power delegated to local government must remain inert, it must be clear that the Legislature intended to occupy the field or declared a policy at war with the decision made by local government. The delegated power may not be restrained upon the basis of speculation or dubious inference. [29 *N. J.* at 187]

It is sufficient to observe .that plaintiff has failed to make the requisite showing that the Legislature intended to preempt the field.

Plaintiff also relies upon *State v. Ulesky,* 54 *N. J.* 26 (1969). There, we invalidated an ordinance which required all persons who had been convicted of a crime within the past 10 years and who were in the municipality to register

with the chief of police, furnish a written statement under oath, be photographed or fingerprinted and carry a card furnished by the police department. We found the ordinance to have been preempted by State statutes concerning probation, parole and the registration of narcotic offenders. *State v. Ulesky* is clearly distinguishable from the situation before us. In that case, the Legislature had actually passed legislation on the same subject as that of the municipal ordinance. *Id.,* 54 *N. J.* at 30. In addition, the municipal ordinance would have undermined the State's overall policy concerning the rehabilitation of offenders. *Id.,* 54 *N. J.* at 31. Finally, the administrative burden imposed in that case was much more severe than that which would be imposed in the instant case.

Finally, plaintiff contends that by requiring disclosure of information from truck drivers this provision violates the civil rights of those drivers and places an undue burden on interstate commerce. We also find these arguments to be without merit. Ordinances requiring the registration of vehicles have been upheld in a variety of similar contexts. *See, e. g., Collingswood v. Ringgold, supra,* 66 *N. J.* at 356, 369; *Edwards v. Mayor, Borough of Moonachie,* 3 *N. J.* 17 (1949); *Allinder v. Homewood,* 254 *Ala.* 525, 49 *So.* 2d 108 (Sup. Ct. 1950); *Juengel v. Glendale,* 164 *S. W.* 2d 610 (Mo. Ct. App. 1942); 7 *McQuillin, supra,* § 24.564 at 616. As to the claim that this requirement constitutes an interference with interstate commerce, it is necessary to determine whether the burden on interstate commerce is "undue or discriminatory." *Collingswood v. Ringgold, supra,* 66 *N. J.* at 360; *Moyant v. Paramus, supra,* 30 *N. J.* at 550–52. When compared with the underlying justification for this ordinance, the burdens imposed by the registration requirement pale by comparison and are, at best, minimal. *See generally, Nippert v. City of Richmond,* 327 *U. S.* 416, 66 *S. Ct.* 586, 90 *L. Ed.* 760 (1946); *Michigan Public Utilities Com. v. Duke,* 266 *U. S.* 570, 45 *S. Ct.* 191, 69 *L. Ed.* 445 (1925); *Collingswood v. Ringgold, supra,* 66

N. J. at 359–62; *Moyant v. Paramus, supra,* 30 N. J. at 550–52; *Garneau v. Eggers, supra,* 113 N. J. L. at 249–50. Hence, we sustain this provision in its entirety.

III. *Equal Protection — Is the Ordinance Discriminatory?*

As previously noted, plaintiff's truck center is the only facility subject to the provisions of this ordinance. *See* note 1 *supra.* Plaintiff relies on this fact and contends that the ordinance is arbitrary, unreasonable and discriminatory. Plaintiff further argues that criminal conduct which has occurred at the Center is also prevalent elsewhere in the town.

The fact that plaintiff's parking lot is the only facility in Kearny which is subject to the ordinance does not in itself make the ordinance unlawfully discriminatory. *Harvey v. Essex Freeholder Board,* 51 N. J. Super. 363, 367 (Law Div. 1958), aff'd, 30 N. J. 381 (1959); *Silco Automatic Vending Co. v. Puma,* 105 N. J. Super. 72, 83 (Law Div. 1969), rev'd on other grounds, 108 N. J. Super. 427 (App. Div. 1970). Similarly, the ordinance is not invalid merely because it could have done more to combat the evils which it seeks to address. *Dandridge v. Williams,* 397 U. S. 471, 486–87, 90 S. Ct. 1153, 1162–63, 25 L. Ed. 2d 491, 503 (1970); *Troy Hills Village v. Parsippany-Troy Hills Tp. Council,* 68 N. J. 604, 633 (1975); *N. J. Chapter, American Inst. of Planners v. N. J. State Bd. of Professional Planners,* 48 N. J. 581, 602 (1967), appeal dismissed, 389 U. S. 8, 88 S. Ct. 70, 19 L. Ed. 2d 8 (1967); *Robson v. Rodriguez,* 26 N. J. 517, 524 (1958). Rather, the ordinance should be stricken only if its classification lacks any factual basis and bears no rational relationship to the purposes of the enactment.

The appropriate standards for this type of determination were set forth by this Court in *Guill v. Mayor & Council of Hoboken,* 21 N. J. 574 (1956):

The classification satisfies the constitutional test of equality and reasonableness if it rests upon some ground of difference having a

real and substantial relation to the basic object of the legislation or some relevant consideration of public policy. Even though the distinction be narrow, it suffices if it is reasonably concerned with the end legitimately in view. *Ring v. Mayor and Council of Borough of North Arlington*, 136 *N. J. L.* 494 (Sup. Ct. 1948), affirmed 1 *N. J.* 24 (1948). If the local legislative action be not plainly unreasonable or unduly oppressive or discriminatory in this regard, its policy is not a justiciable question. . . . In the selection of the class for police regulation, neither "abstract symmetry" nor "mathematical nicety" is requisite. . . . There is no "infallible or all-inclusive" test to determine whether "a given difference between the subjects of legislation is enough to justify the subjection of one and not the other to a particular form of disadvantage"; the nearest approach to a definite rule is that, while the "difference need not be great," the classification cannot be arbitrary or illusory, but must bear some just and reasonable connection with the primary object of the legislation; a particular classification is not repugnant to the Fourteenth Amendment merely because "inequality actually results"; every classification of persons and things for regulation by law produces inequality in some degree; to vitiate the regulation the inequality must be "actually and palpably unreasonable and arbitrary." . . . It suffices if the classification have a rational and just relation either to the fulfillment of the essential legislative design or to some substantial consideration of policy or convenience bearing upon the common welfare. . . .

\* \* \* \* \* \* \* \*

Arbitrary selection can never be justified by terming it classification. Classification must itself be fair and impartial and not arbitrary or illusory, grounded in material distinctions and differences concerned with the central legislative policy; and it satisfies the constitutional standard if there be any conceivable state of facts affording a just ground for the action taken, a difference of degree having material relevancy to the police policy in view. If there be a reasonable distinction of circumstances, there is not the oppressive inequality at odds with the equal protection principle. *Washington National Insurance Co. v. Board of Review*, 1 *N. J.* 545 (1948). [21 *N. J.* at 582–83; citations omitted]

*See also Dandridge v. Williams, supra,* 397 *U. S.* at 485, 90 *S. Ct.* at 1161, 25 *L. Ed.* 2d at 501–502; *Collingswood v. Ringgold, supra,* 66 *N. J.* at 370; *Robinson v. Cahill,* 62 *N. J.* 473, 491–92 (1973), *cert.* denied, 414 *U. S.* 976, 94 *S. Ct.* 292, 38 *L. Ed.* 2d 219 (1973); *Jackman v. Bodine,* 55 *N. J.* 371, 382–83 (1970), *cert.* denied, 400 *U. S.* 849, 91 *S. Ct.* 39, 27 *L. Ed.* 2d 87 (1970); *Jones v. Falcey,* 48 *N. J.* 25, 39–40 (1966).

The classifications drawn by the Kearny ordinance, while neither "mathematically perfect" nor totally free of discriminatory effect, do nevertheless bear a real and substantial relationship to the ends established by the ordinance.

Regulation of parking lots on the basis of size, for instance, has generally been regarded as valid. *See* 7 *McQuillin, supra,* § 24.648 at 752. In the context of the instant case, it was reasonable for the municipality to conclude that facilities with parking capacities in excess of 30 vehicles were more troublesome and required greater regulation than facilities of a smaller size. Therefore, distinguishing between those lots which serve less than 30 vehicles and those with greater capacities seems to be quite reasonable. This is especially true in light of the fact that plaintiff's facility accommodates as many as 200 vehicles. In *Briggs v. City of Los Angeles,* 154 *Cal. App.* 2d 642, 316 *P.* 2d 408 (Dist. Ct. App. 1957), the court upheld a city ordinance regulating only those parking lots with capacities in excess of eight vehicles.

Regulation of parking facilities on the basis of the nature of the operation has also been sustained in the face of charges of unjust discrimination. In *Ring v. North Arlington, supra,* 136 *N. J. L.* 494, the former Supreme Court stated:

In the exercise of the power to license for regulation and revenue, distinctions may be made not only between businesses of different character, but also between businesses of the same general class where there are substantial differences in the subject-matter and trade methods and practices related to the object of the legislation. The inquiry is whether there are differences which warrant separate treatment related to such distinctions. [136 *N. J. L.* at 498]

In the instant case, plaintiff's facility may be rationally distinguished from the several truck terminals or distribution centers which are also located in Kearny. For example, it may be assumed that because these other facilities engage in the loading and unloading of trucks, their operators maintain

fairly close supervision over vehicles which use these facilities. By contrast, the owners and operators of Jersey Truck Center exercise only limited control over the employees of their many subtenants. The Center also differs from other truck terminal or distribution centers because of the greater likelihood at such facilities that the only truck drivers on the property will be those drivers transacting business there. Finally, as Kearny's Chief of Police testified, the other truck terminals simply have not presented problems to the same extent as the Center. Hence, we find this classification to be reasonable and substantially related to the ends of the ordinance. *See Ring v. North Arlington, supra,* 136 *N. J. L.* 494 (upholding an ordinance regulating used car dealers but not new car dealers); *Chaiet v. East Orange, supra,* 136 *N. J. L.* at 378 (sustaining an ordinance regulating businesses selling motor vehicles from open air lots, but not businesses operating from show rooms); *Steiker v. East Paterson, supra,* 137 *N. J. L.* at 654 (same; struck down on other grounds); *cf. Lenci v. Seattle, supra,* 388 *P.* 2d at 932.

Finally, contrary to the holdings in *Ricca v. Belleville,* 1 *N. J. Super.* 139 (App. Div. 1948) and *Hart v. Teaneck Tp.,* 135 *N. J. L.* 174 (E. & A. 1947), both cited by plaintiff, the ordinance in the instant case is not intended to put plaintiff out of business or to unfairly assist its competitors.

Affirmed as modified.

*For affirmance as modified*—Chief Justice HUGHES, Justices MOUNTAIN, SULLIVAN, PASHMAN, CLIFFORD and SCHREIBER and Judge CONFORD.—7.

*For reversal*—None.