PIETRO ROSELLE, VERONICA ROSELLE, VINCENT APICE, ANNA APICE, FRANK MARINARO AND THERESA MARINARO, PLAINTIFFS-RESPONDENTS, v. THOMAS WRIGHT, Jr., BUILDING INSPECTOR OF THE TOWNSHIP OF LIVINGSTON, DEFENDANT-APPELLANT.

Argued March 26, 1956—Decided April 30, 1956.

*Mr. Louis Borl* argued the cause for appellant.

*Mr. Samuel A. Larner* argued the cause for respondents (*Messrs. Budd, Larner & Kent,* attorneys).

The opinion of the court was delivered by

HEHER, J.  The issue here concerns the legal sufficiency of an amendment to the Township of Livingston's zoning ordinance adopted May 31, 1955, excluding from a Business district 27 enumerated "buildings and uses," "storage garages" among them, but permitting "private and public garages" in all such districts.  The preexisting regulations did not forbid "storage garages" in a Business zone.  The amendment also increased from seven to nine feet, in relation to the district boundary line, the side-yard requirement of a building erected on a lot in a Business district adjoining a lot in a Residence district, although the parallel restriction on the adjoining lot in the Residence zone remained unchanged.  The provision of off-street parking facilities was made obligatory for new buildings to be devoted to business or "non-dwelling" use.  And it was also provided, this for the first time, that every building erected in a Business district, designed or intended to be used for a permissible "business purpose," shall "face or front upon a main street," designated for "the purpose of this ordinance" as Livingston Avenue, McClellan Avenue, Mt. Pleasant Avenue, Northfield Road, South Orange Avenue, and State Highway Route No. 10, but not Franklin Avenue.

On April 4, 1955 plaintiffs applied to the local building inspector for a permit to construct of masonry a one-story building, 37 feet x 70 feet, on a lot 45 feet wide situate in a Business zone, designed to house "four or five" trucks used by some of the plaintiffs in the pursuit of a garbage-disposal business.  The lot is part of an L-shaped plot owned by plaintiffs fronting 105.40 feet on the northeasterly side of McClellan Avenue and extending back a depth of 269.20 feet along the southeasterly side of McCall Avenue, and thence in a southeasterly direction to Franklin Avenue and along

the northeasterly side of Franklin Avenue 136.62 feet to lands of one Luciano on the northeast corner of the McClellan Avenue intersection. The lot in question adjoins the Luciano property on the east; the remainder of plaintiffs' Franklin Avenue frontage is zoned for Residence use; the 45-foot lot extends northwestwardly from Franklin Avenue for a depth of 200 feet to the southeasterly line of the parallel McCall Avenue, and all of plaintiffs' plot extending in a westerly direction from the 45-foot lot, a distance of 120 feet to McClellan Avenue, lies in the same Business district. The plan submitted by plaintiffs shows that the proposed structure would front, not on Franklin Avenue, but on a 30-foot private driveway on their own plot running west along the Luciano lands to McClellan Avenue, in the area classified for Business use. The rear of the building is to be set back 25 feet from the property line and 50 feet from the center line of Franklin Avenue, a requirement of the zoning ordinance; and there will be a side yard of at least seven feet between the building and the zone boundary line. The rear of the building will have no doorway affording access to Franklin Avenue.

The application for the building permit was submitted to the local planning board at a session held April 12, 1955, but no action was taken other than to ask for the advice of the township solicitor. Plaintiffs' counsel urged prompt action. The ordinance creating the planning board, adopted June 21, 1954 under L. 1953, c. 433, N. J. S. A. 40:55–1.14, provided for the submission to that agency, for hearing, consideration and recommendatory action within 45 days, of all applications for permission to build in a Business zone. An earlier application had been denied, and the denial was sustained on judicial review as a proposal not conforming to the side-yard requirements of the ordinance. But on April 26 ensuing the planning board considered, and on May 24 approved, a plan to amend the zoning ordinance as provided in the amendment adopted May 31, 1955, introduced May 16, now under review. Neither the building inspector nor the planning board notified plaintiffs of any action taken

on the application. This proceeding in lieu of *mandamus* to compel the issuance of the building permit was begun May 9, 1955.

Judge Ewart found that the "proposed building is a 'storage garage' within the definition of the amended ordinance" and the exclusion of such use from Business zones constituted an arbitrary and unreasonable exercise of the zoning function, and so the regulation in this regard was *ultra vires* and void; and, since the application otherwise conformed to local law, there was judgment commanding the issuance of a building permit accordingly. 37 *N. J. Super.* 507 (*Law Div.* 1955).

The defendant building inspector's appeal to the Appellate Division of the Superior Court was certified here for decision on our own motion.

The contrary insistence is that the regulation is well within the considerations of public "health and welfare" sustaining police action. The "private and public garages" permissible in all Business districts are defined thus: Private garage: "An attached or detached building or part thereof, used as an accessory to a main building or dwelling, with a capacity for the storage of not more than three motor vehicles and in which no occupation or business for profit is carried on." Public garage: "Any premises, except those described as a private garage or storage garage available to the public for the storage, care or repair of motor vehicles." The excluded "storage" garage is differentiated in these terms: "Any premises, except those described as a private garage or public garage, used exclusively for the storage of motor vehicles."

The argument for this seemingly incongruous and unreal classification is this: Livingston is a "suburban municipality" 14 square miles in area, "primarily" a "residential community of one-family dwellings." Since the adoption of the original zoning ordinance on January 31, 1929, "only single-family dwellings have been permitted in its Residence districts." The federal census of 1950 disclosed a population of 9,932; its population now is roughly 18,000. There are

three Residence districts, "A," "AA," and "B," a Retail Business district, "intended for a regional shopping center that never materialized," an Industrial district in the "northwesterly corner" of the township, and "ten Business districts scattered throughout the area"; the "Business district in question is located in the northeasterly quadrant of the map near the Borough of Roseland boundary line."

Counsel continues: All the Business districts are "strip-zoned." The "depth of such business areas, measured from the street line, is (with several exceptions not here material) 165 feet"; all "Business districts, therefore, have a Residence district abutting them," and "whatever criticisms there may be relative to the subdivision of the municipality into the several districts shown on the zoning map, particularly with respect to the strip-zoning of the Business districts, the map, and the ordinance of which it is a part, does disclose a comprehensive plan designed to promote the specified statutory purposes," *R. S.* 40:55–32; and, since "single-family residences, dwelling apartments, stores, shops and other types of business are, as they always have been, permitted structures and uses in a Business district," "it was only natural that private garages to house the family car or the delivery truck or two of the merchants in business, be permitted," and "a place where the resident or merchant might have his automobile repaired or stored while undergoing repairs is essential to the public convenience and necessity, and the traffic generated by such places of business is not such as to cause great public concern—less, even, than the establishment, for instance, of the well-known super-market of today with its almost constant heavy traffic." Secondly, the exclusion of "storage garages" from Business districts has a "reasonable relation to the health and welfare of the community, at least in the light of the strip-zoned pattern" of the established Business districts, and "so far as the plaintiffs' proposed use is material to the issue, the storage of garbage trucks in a building lying cheek by jowl with a residential district poses a health hazard with which not only the municipal authorities but the public as a whole are con-

cerned." And finally, "aside from the proposed use of the site for the storage of garbage trucks, a storage garage, whether it were designed to house only four or five trucks or a score or more motor vehicles, would have a negative impact upon property values in any adjacent Residence district."

In a word, it is said, that Livingston "is highly residential and is still growing—rapidly"; in "Residence districts that growth (structurally) is limited to single-family dwellings," and "any building in the nature of a storage garage, located though it may be in a Business district, cannot but immediately affect adversely the neighboring residential area." These are, it is insisted, the "factors to be considered in testing, without extraneous evidence, the reasonableness or unreasonableness of the ordinance."

The essential question is whether the classification has a real and substantial relation to the considerations, one or more, to be advanced by zoning, *R. S.* 40:55–32, for if it falls short of this standard the regulation to that extent constitutes an arbitrary and unreasonable interference with the basic right of private property as well as a transgression of constitutional and statutory zoning principle.

The amendment to the *State Constitution of* 1844 adopted at a special election held September 20, 1927, *Article IV, Section VI, paragraph 5*, did not constitute a new grant of basic power theretofore beyond the domain of the Legislature. By *Article III, paragraph 1*, and *Article IV, Section I, paragraph 1* of that Constitution, the people granted to the Legislature full sovereign authority save as therein limited; and this included the police power. Planning is comprehended in this inherent right of sovereignty so to order the affairs of the people as to serve the common essential need; and zoning is an implementation of planning, concerned as it is with common social and economic interests and needs encompassed by the basic power of government to "make, ordain and establish all manner of wholesome and of reasonable laws, not repugnant to the Constitution," as may be deemed to be "for the good and welfare of the commonwealth,

and all the subjects of the same." *Sedgwick on Statutory and Constitutional Law* (1st ed. 1857), 507. Thus, there was no residuum of sovereign power, apart from the police, invoked by this amendment, nor by the somewhat similar provision of the 1947 *Constitution, Article* IV, *Section* VI, *paragraph* 2, for the enlargement of the general legislative function as so laid down in the organic law. The police power does not have its genesis in a written constitution. It is an essential element of the social compact, an attribute of sovereignty itself, possessed by the states before the adoption of the Federal Constitution.

These constitutional provisions relating to zoning were designed to remedy the judicial denials of the fullness of the power and to regulate its use so as to accommodate essential common and individual rights in the fullfillment of the principle. *Schmidt v. Board of Adjustment of City of Newark,* 9 *N. J.* 405 (1952); *Mansfield & Swett, Inc., v. Town of West Orange,* 120 *N. J. L.* 145 (*Sup. Ct.* 1938).

But in the exercise of the police power to this end, legislative action is *ex necessitate* contained by the constitutional grant, 1947 *Constitution, Article* IV, *Section* VI, *paragraph* 2; and thus we have zoning by districts according to the character of the lands and structures and their peculiar suitability for particular uses, to serve the general welfare in the given areas of police action, and uniformity and equality of use within the division, devoid of invidious distinctions and discriminations not concerned with the public purpose rightly in view. It is fundamental to "use" limitation by districts that all property in like circumstances be treated alike. The use restraints must be general and uniform in the particular district. All this, as we have said, in virtue of the legislative grant itself, quite apart from constitutional precepts for the security of basic civil liberties.

The exercise of the police power is contained by the rule of reason, the antithesis of the arbitrary action that is alien to the genius and spirit of our democratic society. The constitutional principles of due process and the equal protection of the laws ordain that the exercise of the power

be wholly free of unreason and arbitrariness, and that the means selected for the realization of the policy bear a real and substantial relation to that end. And in zoning there must be a rational relation between the regulation and the promotion of the general welfare within the reach of the statutorily prescribed areas of action, and that the means invoked be in keeping with the public need. Arbitrary deviation from the general rule is forbidden; and, by the same token, undue discrimination in treatment and classification vitiates the regulation. *Katobimar Realty Co. v. Webster,* 20 *N. J.* 114 (1956). Restraints upon land use cannot be capricious or unduly discriminatory. There cannot be discrimination between persons or property not reasonably related to the service of an essential public need. *Welch v. Swasey,* 214 *U. S.* 91, 29 *S. Ct.* 567, 53 *L. Ed.* 923 (1909); *Washington National Insurance Co. v. Board of Review,* 1 *N. J.* 545 (1949). This is peculiarly so in the exercise of the zoning police power. Constitutional uniformity and equality requires that classification be founded in real and not feigned differences having to do with the purposes for which the classes are formed. *Katobimar Realty Co. v. Webster, supra; Beirn v. Morris,* 14 *N. J.* 529 (1954). See *Hadacheck v. Sebastian,* 239 *U. S.* 394, 36 *S. Ct.* 143, 60 *L. Ed.* 348 (1915).

The regulation here does not satisfy the standard of uniformity and equality. The exclusion of all "storage" garages from Business zones open to "private" and "public" garages as defined in the ordinance does not bear a real and substantial relation to the public health, safety, morals, convenience or welfare, in the particulars governing zoning action, one or more, set down in *R. S.* 40:55–32, and so it contravenes constitutional precept and the basic policy of the statute. There is no discernible reason of policy for this differentiation. "Public" garages cover "any premises" other than "those described" as a "private" garage or "storage" garage, "available to the public use for the storage, care or repair of motor vehicles." Motor vehicles may have "storage" in a "public" garage but not in a "storage" garage, a patently

arbitrary and illusory distinction. The exclusion of "storage" garages has no relation to the use of the stored vehicles. The ban on "storage," mere safekeeping, extends to all such vehicles, even new vehicles not yet put to use. The regulation does not proceed on the hypothesis that the bare storage of the vehicles has elements of danger to the public health, safety, or welfare. It cannot matter that the "storage" garage, as defined in the ordinance, is used "exclusively" for the storage of motor vehicles. Only in this wise is the "storage" garage distinguished from the "public" garage, a wholly artificial concept in no way material to zoning policy in the particular context. It was frankly acknowledged on the oral argument that the design was the exclusion of storage for trucks employed in garbage disposal, presumably because of aesthetic sensitivity, but the more specific limitation was deemed illusory classification.

The planned use renders irrelevant the provision of the amended ordinance, section 5, that "no new building which is arranged, designed or intended to be used, in whole or in part, for a business purpose or for a non-dwelling use" shall be "built, erected or placed in a Business District, * * * unless there is provided an area for the off-street parking of motor vehicles * * *," according to the "total gross floor area" of the building itself. Off-street parking facilities would serve no purpose in these circumstances; and, such being the case, their requirement would be arbitrary and unreasonable. We are not now concerned with a possible radically different use of the building in other circumstances in the remote future.

We concur in Judge Ewart's findings that the proposed building would not "front" on Franklin Avenue within the intendment of the provision of the ordinance that newly-erected structures "face or front" on a "main street"; and that the increase of the side-yard requirement from seven to nine feet in relation to the zone boundary was designed to bar the planned use should the motivating purpose for the exclusion prove unsustainable. The omission of a corresponding extension in the adjoining Residence "B" district

is significant in this regard. At all events, there is no showing of a legitimate need for a two-foot enlargement of the required side-yard setback.

Affirmed.

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, BURLING and BRENNAN—5.

*For reversal*—Justice WACHENFELD—1.