970 A.2d 992

NEW JERSEY SHORE BUILDERS ASSOCIATION, A NON-PROFIT NEW JERSEY CORPORATION, PLAINTIFF–RESPONDENT, v. TOWNSHIP OF JACKSON, A NEW JERSEY MUNICIPAL CORPORATION LOCATED IN OCEAN COUNTY, DEFENDANT–APPELLANT.

Argued September 9, 2008—Decided May 13, 2009.

*Kevin N. Starkey,* argued the cause for appellant (*Starkey, Kelly, Bauer, Kenneally & Cunningham,* attorneys; *Mr. Starkey* and *Dina R. Khajezadeh,* on the briefs).

*Paul H. Schneider,* argued the cause for respondent (*Giordano, Halleran & Ciesla,* attorneys; *Mr. Schneider, Matthew N. Fiorovanti* and *Afiyfa H. Ellington,* on the briefs).

*Edward L. Lloyd,* submitted a brief on behalf of *amici curiae* Sierra Club and Association of New Jersey Environmental Commissions.

Justice LONG delivered the opinion of the Court.

At issue in this appeal is the validity of a tree removal ordinance, enacted by a municipality under the police power. The

ordinance requires a property owner to replace any tree that is removed (with certain enumerated exceptions) or, if that is not feasible, to make a payment into a fund dedicated to the planting of trees and shrubs on public property. The trial judge held that the intent of the ordinance was to ameliorate the hazards of removing trees by regulating "the indiscriminate and excessive cutting of trees on the specific properties," and that the payment for tree placement on public property "does not bear a real and substantial relationship" to that goal. The Appellate Division affirmed based on the reasoning of the trial judge.

■ The municipality filed a petition for certification that we granted. We now reverse. The proper test for the validity of an ordinance enacted pursuant to the police power is the "rational basis" test, which the tree removal ordinance plainly satisfies. The lower courts erred in failing to accord deference to the presumption of validity of the ordinance and by too narrowly characterizing the goals underlying it. To be sure, the ordinance was intended to ameliorate the evils of tree cutting on particular pieces of property. But that was not its only purpose. Indeed, the ordinance was limned, as well, to serve general environmental goals, including the maintenance of the biomass of the municipality with its concomitant ecological benefits of habitat, tree canopy, and oxygen production. The means employed in the tree removal ordinance were rationally related to those objectives.

## I.

In 2003, the Township of Jackson ("Township") adopted the tree removal ordinance ("ordinance") that is at issue here, under the general police power, *N.J.S.A.* 40:48–2.[1] The stated purposes of the ordinance are as follows:

_____

[1] An earlier tree removal ordinance, enacted in 2001 under the Municipal Land Use Law (MLUL), *N.J.S.A.* 40:55D–1 to –163, had been declared invalid

(1) The indiscriminate, uncontrolled and excess destruction, removal and cutting of trees upon lots and tracts of land within the Township has resulted in creating increased soil erosion and dust, has deteriorated property values and further rendered land unfit and unsuitable for its most appropriate use, with the result that there has been deterioration of conditions affecting the health, safety and general well-being of the inhabitants of the Township of Jackson. It is the intent, therefore, of this chapter to regulate and control the indiscriminate and excessive cutting of trees in the Township.

(2) Trees are declared to be important cultural, ecological, scenic and economic resources. Proper management of this resource will ensure its maintenance and result in greater economic returns. A property forestry management program is intended to meet the objectives of preserving, protecting, enhancing and maintaining trees and providing opportunities for continuing uses of forest resources which are compatible with the maintenance of the environment. This will be accomplished by ensuring proper management of forest and trees through the application of sound management practices. To that end, it shall be unlawful to cut down, damage, poison or in any other manner destroy or cause to be destroyed any trees covered by this chapter, except in accordance with the provisions of this chapter.

[Township of Jackson, N.J., Admin. Code ch. 100, § A (2003).]

The ordinance provides that, "[u]nless specifically exempted [2] herein, it shall be unlawful for any person to remove or cause to be removed any tree with a trunk diameter of three (3) inches or more DBH (Diameter Breast Height) [3] without first having obtained a tree removal permit to do so." *Id.* § B(1). To obtain such a permit, a landowner must "make application to the Township Forester by filing a written application and paying [a] fee" of ten dollars for each new or existing lot. *Id.* §§ C(1), G(1). After an application "has been submitted, no permit shall be issued until

---

due to various defects in drafting, including the absence of criteria regarding the use of a tree escrow fund. No appeal was taken from that order.

2 Specific exemptions under the ordinance include the removal of "[a]ny tree of less than three (3) inches [Diameter Breast Height]," as well as the removal of trees "planted and grown for commercial purposes on property used as a commercial nursery or tree farm," "by an owner of property for the owner's own consumption as firewood," or "for the purpose of establishing a survey lien." Township of Jackson, N.J., Admin. Code ch. 100, § K(1)(b), (e), (g)-(h) (2003).

3 According to testimony at trial, DBH measures the tree diameter at breast height, which is "four and a half feet above the root crown or the grade."

a tree save plan for the lot or parcel has been reviewed and approved by the Township Forester with recommendation of the Shade Tree Commission, Township Engineer, and Environmental Commission, where appropriate." *Id.* § C(1).

The ordinance permits residential developers to clear a certain percentage of the property without tree replacement:

> For all existing and new residential development with a proposed lot area no more than 40,000 square feet, up to fifty (50%) percent of the lot area may be cleared of trees without replacement trees required. For residential development with a proposed lot area of 40,000 square feet or greater, up to 20,000 square feet in area of proposed trees may be removed without replacement trees required. The lot area for which tree replacement shall not be required as set forth herein shall be the "Exempt Area."
>
> [*Id.* § C(2)(a).]

Nonresidential developers must "replace all trees removed in accordance with [Section I] of [the] ordinance." *Id.* § C(4).

A permit to remove a tree will be granted if one or more of the following criteria has been met:

> (a) The tree is located in an area where a structure or improvements will be placed according to an approved plan and the tree cannot be relocated on the site because of age, type or size of the tree.
>
> (b) The tree is dead, diseased, injured, in danger of falling, is too close to existing or proposed structures, interferes with existing utility service, creates unsafe vision clearance or conflicts with other ordinances or regulations.
>
> (c) The tree is to be removed for harvesting as a useful product or for the purpose of making land available for farming or other useful or productive activity, is to be removed in furtherance of a forest management plan or soil conservation plan or to serve some other useful or beneficial purpose.
>
> [*Id.* § F(1)(a)-(c).]

However, the "Township Forester, with recommendation from the Shade Tree Commission and Township Engineer, . . . may deny the permit if the following conditions exist: any negative effect upon ground and surface water quality, specimen trees, soil erosion, dust, reusability of land, and impact on adjacent properties." *Id.* § F(2).

If the Township Forester grants the tree removal permit, a tree removal fee is assessed. *Id.* § G(2). That fee is "twenty-five dollars ($25) for each residential lot on which trees [outside of the

exempt area] are to be removed," and "fifteen dollars ($15) per tree removed, up to a maximum of six hundred dollars ($600) per acre," for all non-residential lots. *Id.* § G(2)(a)-(b).

The ordinance also explains the tree replacement scheme:

Dead and fatally diseased existing trees, as determined by a Certified Tree Expert, shall not require replacement tree planting. Existing tree replacement shall comply with at least one of the following criteria:

(1) One-to-One Tree Replacement: For each tree six (6) inches in DBH or greater that is removed, the applicant shall prepare a replanting scheme on other treeless areas of the property to compensate the clearing of the tree area. The replacement plan or landscape plan shall reflect a one-to-one tree replacement for each tree six (6) inches or greater to be removed. All proposed replacement trees shall be in accordance with § 109–173[(A)](2)(b)(3)[4] and submitted for review and approval prior to the issuance of a tree removal permit.

(2) Tree Area Replacement/Reforestation: For each square foot of tree area to be removed, the applicant shall prepare a reforestation scheme on other treeless open space areas of the property to compensate the clearing of the tree area. The reforestation plan shall be based on [a] 20′ × 20′ grid. Of this number of trees, 10% shall be balled and [burlapped] 2″-2 1/2″ caliper,[5] 20% shall be balled and [burlapped] 1 3/4″-2″ caliper, 30% shall be bare root 1 1/4″-1 1/2″ caliper and 40% shall be bare root 6 to 8 foot tall whips. A mixture of trees, indigenous to the area and site shall be utilized. Proposed trees shall be planted in natural groves and may be spaced 5 feet to 20 feet on enter. The ground shall be seeded with a meadow grass mixture approved by the Township Forester.

(3) Tree Cost Replacement: Should the quantity of the trees to be removed be greater than the quantity of actual tree replacement as identified on the tree replacement/landscaping plan due to limited available planting area, then the outstanding balance shall be provided in accordance with the replacement tree value calculations as indicated:

(a) Replacement tree value calculations:

---

4 That section provides:

The following minimum sizes should be utilized for trees and shrubs unless otherwise approved by the municipal agency:

(a) Shade trees: two inches caliper or 10 to 12 feet tall, whichever is greater.

(b) Evergreens, ornamental and foundation trees: 1 1/2 to 1 3/4 inches B & B or five to six feet tall, whichever is greater.

(c) Shrubs: 2 to 2 1/2 feet in height or spread, except in the case of dwarf species or varieties which do not attain this size.

5 According to testimony at trial, caliper measures the tree diameter at six inches above the root crown.

The replacement value of all trees to be removed where replacement trees are required by this ordinance shall be calculated as follows:

| (1) | Trees to be Removed Size/DBH | Replacement Trees $/Tree |
|---|---|---|
| | Greater than 6″ Up to 12″ | $200.00 |
| | Greater than 12″ Up to 18″ | $400.00 |
| | Greater than 18″ Up to 24″ | $600.00 |
| | Greater than 24″ | $800.00 |

[*Id.* § I.]

If the landowner does not replant but pays the replacement fee, that fee is placed into a "Tree Escrow Fund ... established by the Township for the administration and promotion of tree and shrub planting projects on or within public properties or facilities." *Id.* § I(3)(a)(3); *see also id.* § G(3).

On April 16, 2004, New Jersey Shore Builders Association (NJSBA) filed an action in lieu of prerogative writs challenging the ordinance. A two-day bench trial ensued during which testimony was elicited on behalf of the parties. NJSBA's expert, Peter Steck, a licensed professional planner, testified that the ordinance "creates a new section which is outside of what is typically considered land use controls." Steck described the ordinance and provided his conclusions, which included that: the ordinance does not promote a property forest management plan; the ordinance is inconsistent, overly vague, and imprecise; and the ordinance unfairly distinguishes between residential lots and commercial lots, which does not further its stated purpose. In addition, Steck concluded that the tree replacement fees paid into the tree escrow fund could constitute a tax:

the placement of a tree that might be more than a mile away in the next drainage basin and ... may, in fact, be shrubbery instead of trees has no relationship to the removal of a tree on that initial residential lot that produced the fee. And it would seem to me there has to be some rational connection between applying this Ordinance and generating a fee to remedying the removal of that tree. Otherwise, it simply amounts to another tax mechanism because it essentially is treated as part of the general fund of the Municipality.

And consequently, it would seem to me there is an unhealthy incentive for the Municipality to use this Ordinance to generate fees because it simply lowers the effect of [the] tax rate because it lowers the development expenses of the Municipality in a way that is unrelated to the development that generated that fee.

Steck further concluded in his expert report, which was admitted into evidence, that the escrow fund "bears no rational relationship to the source of fees and does not remedy any negative effects of tree removal. Potentially, a tree removed on a parcel in one end of Jackson Township produces a fee to plan[t] a shrub on a Township property a mile or more away."

Jeffrey Nagle, a certified landscape architect and a professional planner, who was the primary drafter of the ordinance, testified on behalf of the Township. He stated that he had studied other municipalities' ordinances and specifically had relied on the "no net loss" policy reflected in the state statute, *N.J.S.A.* 13:1L–14.2, as a model for the ordinance. Nagle explained the state scheme, which requires that trees removed from state property be replenished on state, county, or municipal property via a hierarchy of options: (1) replacement on the site from which the trees were removed; (2) if replacement is not possible on the original site, replacement within the municipality where that state property is located; or (3) if replacement is not feasible on-site or within the municipality, replacement within five miles of the subject property. That statute also provides that, if none of those options are feasible, tree replacement must be conducted elsewhere. *N.J.S.A.* 13:1L–14.2(b)(3).

Nagle analogized the state system to the system used by the Township, which prefers replanting on or near the site but permits replanting on public property anywhere within the municipality if a location on or near the site is not feasible. According to Nagle, the idea behind the system "is the reforestation or reestablishment of the tree canopy with[in the] Township as a whole and not in any one particular area." Nagle stressed that

biomass and ... the beneficial effects of the tree [are] not related to the location from which a tree was taken as much as [they are] related to the entire Township

that it's going to be located in.... [T]he replacement on the same site would be more of an aesthetic value rather than an environmental benefit.

He explained that the biomass encompasses:

the[ ] entire canopy layer and every portion of existence underneath that canopy layer to the soil layer of the ground ... it's a whole microenvironment which includes the tree trunks, the leaves that are on top of the tree, the transpiration, including the leaf litter that falls beneath the tree on the ground and all the vegetation that is underneath the canopy of that tree is basically considered ... biomass, and that biomass has inherent benefit to the environment.

Nagle further noted that

the environmental benefits of replacing [a tree] across the site[, i.e., not on-site,] are beneficial to [the] Township as well as if it was just replaced on the site [because] it would also have biomass or environmental benefits, but more so on the same site would just be aesthetics in that the appearance of the trees would be replaced on that site.

Robert Eckhoff, the Township Forester and a certified tree expert, explained how the ordinance operates. Eckhoff testified that landowners who are required to replace trees may choose whether to undertake one-to-one replacement, to employ tree area replacement/reforestation, or to pay into the escrow fund. Eckhoff explained that the ordinance, through reference to Section 109–173(A) of the Code, requires landowners who undertake one-to-one tree replacement to plant only a two-inch-diameter shade tree or a five- to six-foot evergreen tree,[6] regardless of the size of the tree that the landowner removed. Landowners who do not elect to replant on-site instead pay into the escrow fund a tree replacement fee calculated based on a schedule set forth in the ordinance, which ranges from $200 to $800 depending on the size of the removed tree.

According to Eckhoff, the ordinance encourages landowners to replace trees on-site, by making one-to-one tree replacement the least expensive option. Because the tree replacement fee is calculated based on the size of the removed tree, landowners who

---

6 Most of the testimony, as well as the trial court's decision, focused on two-inch-diameter trees as replacement trees. We thus refer to the size requirement as two-inch-diameter trees, although five- to six-foot evergreen trees are also an option.

remove a large tree will pay less to replant a two-inch-diameter tree on-site than they would be required to pay into the escrow fund. In addition, landowners can avoid paying installation costs by doing the replanting themselves. Eckhoff testified that the Township prefers on-site one-to-one tree replacement, because it ensures that "the site balance[s] out."

The tree replacement fee that landowners pay under the fee schedule correlates to the number of trees that the Township will plant to replace the removed tree. For example, Eckhoff stated that if $800 was deposited into the escrow fund for the removal of a twenty-four-inch-diameter tree, the Township could replace that tree with four smaller trees or with a twenty-four-inch-diameter tree, which would actually cost approximately $8,000 to $15,000 to plant. Eckhoff explained that the tree replacement fee is higher when larger trees are removed because removing a larger tree "would require [planting] more trees to replace that [lost] canopy." In addition, planting multiple smaller trees increases other benefits, such as "oxygen production and habitat."

Eckhoff testified that the "Town[ship] is planting trees throughout the Township on public lands as part of the intent of the Ordinance to maintain the tree canopy biomass of the Township and attempt to replace the trees that are being removed by development throughout the Township." Those trees have been planted in Township parks as well as on other public property. Eckhoff clarified that all of those trees have conformed to the two-inch-diameter deciduous or five- to six-foot evergreen size requirements for replacement trees, and that no shrubs have been planted. Eckhoff testified that the actual cost of planting those trees ranges approximately between $205 and $220 per tree.

On December 1, 2005, the trial judge issued a letter opinion, declaring the ordinance invalid. At the heart of the opinion was his determination that the sole stated purpose of the ordinance was to ameliorate the hazards of clear cutting trees—i.e., increased soil erosion, dust, and reduction in property value—on the specific properties from which the trees were removed. Thus, the

judge found that "the central question becomes whether a payment to an escrow fund for trees not to be replaced on[-]site in any way addresses the evils sought to be controlled by the regulation of the indiscriminate and excessive cutting of trees on the specific properties." In ruling, he noted that the Township "failed to establish any nexus between the planting of trees on the public property and the prevention of soil erosion, dust, deteriorating property values and the suitability of land on the sites from which the trees were removed" and that the Township "failed to explain how the planting of the trees on public lands would have any beneficial effect upon the properties from which trees were removed or how it would prevent the hazards caused by clear cutting in future development." Although the judge acknowledged that the Township's experts "made passing reference to the need to maintain the biomass within the Township," he found the argument that the ordinance would address that concern to be "tenuous at best" and "not pursued adequately in the record." Based on that analysis, the judge concluded that "the creation of the Tree Escrow Fund and the utilization of the fund to plant trees on public property only ... does not bear a real and substantial relationship to the purposes of the Ordinance." [7]

The Township appealed and the Appellate Division affirmed, declaring, for the reasons expressed by the trial judge, that "the 2003 ordinance is not a valid exercise of [the Township's police] power because the payment of a fee to plant new trees on other public land does not in any way address the objective of ameliorating the negative effects of removing trees on private property." The Township filed a petition for certification that we granted. 193 *N.J.* 586, 940 *A.*2d 1218 (2008).

---

[7] The judge also declared the ordinance to be void for vagueness, because, for example, it failed to more specifically define when removal is for a "useful or beneficial purpose" or to provide standards for use of the escrow fund. The Appellate Division affirmed that ruling as well. Because no challenge to that conclusion has been advanced before us, regardless of the outcome here, the trial judge's declaration regarding vagueness will remain in effect and the Township will be required to amend the ordinance accordingly.

## II.

The Township argues that the trial judge erred in applying the standard used to analyze ordinances enacted under the Municipal Land Use Law (MLUL), *N.J.S.A.* 40:55D-1 to -163, to test the validity of the ordinance; in failing to apply the rational basis standard, which the ordinance satisfies; in failing to recognize that the purposes underlying the ordinance are broader than mere remediation on the specific property on which trees are removed; and in omitting consideration of the overarching goals of the ordinance, including "limiting the deleterious effect of tree removal on other properties and to other residents." Amici curiae, the Sierra Club and the Association of New Jersey Environmental Commissions, support the Township's arguments.

NJSBA counters that the trial judge analyzed the ordinance under the proper standard; that the ordinance is governed by and violates the MLUL; that the primary purpose of the ordinance is to remediate the effects of tree removal on the property from which the removal occurs, and that replanting on other property does not address that goal; that even in the face of a broader environmental goal, the tree escrow fund for replanting on public property does not forward that purpose; and that the ordinance is a revenue raiser.

## III.

Some preliminary observations are in order. "The central feature of plenary state legislative authority is the 'police power,' which justifies legislation to further the public health, safety, welfare, and morals." Robert F. Williams, *The New Jersey State Constitution* 57–58 (Rutgers Univ. Press, updated ed. 1997). "The police power does not have its genesis in a written constitution. It is an essential element of the social compact, an attribute of sovereignty itself, possessed by the states before the adoption of the Federal Constitution." *Roselle v. Wright,* 21 *N.J.* 400, 409, 122 *A.*2d 506 (1956).

■ Although there is a separate constitutional provision regarding zoning, *N.J. Const.* art. IV, § 6, ¶ 2, it is not a font of power separate from the police power. In his treatise on the New Jersey Constitution, Professor Robert Williams has explained the genesis of that constitutional provision:

> This paragraph was added to the Constitution by an amendment adopted in 1927. The amendment was necessary to "overrule" a 1923 decision of the Supreme Court holding that the legislative authorization to localities to enact zoning ordinances was an unconstitutional attempt to use the police power to interfere with private property rights. . . .
>
> In 1956 in *Roselle v. Wright* the New Jersey Supreme Court stated that the 1927 amendment did not grant any *new* power to the legislature beyond the basic police power, which is the source of the power to zone.
>
> [Williams, *supra,* at 70 (citation omitted).]

As we said in *Roselle, supra:* "These constitutional provisions relating to zoning were designed to remedy the judicial denials of the fullness of the power and to regulate its use so as to accommodate essential common and individual rights in the fulfillment of the principle." 21 *N.J.* at 409, 122 *A.*2d 506 (citing *Schmidt v. Bd. of Adjustment of Newark,* 9 *N.J.* 405, 88 *A.*2d 607 (1952)). Put another way, *N.J. Const.* art. IV, § 6, ¶ 2 serves only to lift a limit that had been judicially imposed upon the exercise of the police power, which remains the wellspring from which the power to plan and zone flows. *See Rumson Estates, Inc. v. Mayor & Council of Fair Haven,* 177 *N.J.* 338, 349, 828 *A.*2d 317 (2003) (citing *Riggs v. Twp. of Long Beach,* 109 *N.J.* 601, 610, 538 *A.*2d 808 (1988)); *Gabe Collins Realty, Inc. v. City of Margate City,* 112 *N.J.Super.* 341, 346, 271 *A.*2d 430 (App.Div.1970) (citing *Schmidt, supra,* 9 *N.J.* at 414, 88 *A.*2d 607).

To be sure, although planning and zoning are exercises of the police power, the Legislature has set forth the template pursuant to which they must be carried out. It enacted the MLUL, "a comprehensive statute that allows municipalities to adopt ordinances to regulate land development 'in a manner which will promote the public health, safety, morals and general welfare.'" *Rumson Estates, supra,* 177 *N.J.* at 349, 828 *A.*2d 317 (quoting *Levin v. Twp. of Parsippany–Troy Hills,* 82 *N.J.* 174, 178–79, 411

*A.*2d 704 (1980)). NJSBA contends that the Township's tree removal ordinance regulates the use of land and thus arises out of and is governed by the MLUL. We disagree.

In reaching our conclusion, we note that the Township specifically declared that it was enacting the tree removal ordinance under *N.J.S.A.* 40:48–2—the police power statute. Further, as NJSBA's expert recognized, the ordinance "is outside of what is typically considered land use controls." *See* William M. Cox et al., *New Jersey Zoning and Land Use Administration* § 1–1 at 2 (2009) ("[T]he [MLUL] grant[s] municipalities the power to enact a master plan which has a land use element and, if such a plan is enacted, to adopt a zoning ordinance."). Although it touches on the use of land, the ordinance is not a planning or zoning initiative that necessarily implicates the MLUL. Indeed, there are numerous ordinances, for example, health codes, environmental regulations, building codes, and laws regulating the operation of particular businesses, that touch on the use of land, but are not within the planning and zoning concerns of the MLUL. Those ordinances are enacted pursuant to the general police power and apply to everyone. That is the nature of the tree removal ordinance at issue here: it is a generic environmental regulation, and not a planning or zoning initiative. Contrary to NJSBA's claims, the ordinance is, thus, not subject to the specific limits in the MLUL, for example, *N.J.S.A.* 40:55D–42, which governs off-tract improvements.

## IV.

We turn then to the standard of review. "Municipalities have the power and authority to enact ordinances in support of the police power." *Hutton Park Gardens v. Town Council of W. Orange,* 68 *N.J.* 543, 564, 350 *A.*2d 1 (1975). However, all "police-power legislation is subject to the constitutional limitation that it be not unreasonable, arbitrary, or capricious, and that the means selected by the legislative body shall have real and substantial relation to the object sought to be attained." *515 Assocs. v. City*

*of Newark,* 132 *N.J.* 180, 185, 623 *A.*2d 1366 (1993) (citing *Bonito v. Mayor & Council of Bloomfield,* 197 *N.J.Super.* 390, 398, 484 *A.*2d 1319 (Law Div.1984)); *see also Roman Check Cashing, Inc. v. N.J. Dep't of Banking & Ins.,* 169 *N.J.* 105, 110, 777 *A.*2d 1 (2001) ("When the means chosen bear a rational relationship to a legitimate state objective and are not arbitrary, capricious, or unreasonable, courts will sustain a legislative enactment." (citing *Williamson v. Lee Optical of Okla., Inc.,* 348 *U.S.* 483, 487–88, 75 *S.Ct.* 461, 464, 99 *L.Ed.* 563, 571–72 (1955))).

 Ordinances enacted pursuant to the police power are presumptively valid. *Brown v. City of Newark,* 113 *N.J.* 565, 571, 552 *A.*2d 125 (1989) (citing *Hutton Park Gardens, supra,* 68 *N.J.* at 564, 350 *A.*2d 1). "The presumption is not an irrebutable one, but it places a heavy burden on the party seeking to overturn the ordinance." *Hutton Park Gardens, supra,* 68 *N.J.* at 564, 350 *A.*2d 1 (citations omitted). Indeed, "factual support for the legislative judgment will be presumed and, absent a sufficient showing to the contrary, it will be assumed that the statute rested 'upon some rational basis within the knowledge and experience of the Legislature.'" *Burton v. Sills,* 53 *N.J.* 86, 95, 248 *A.*2d 521 (1968) (quoting *Reingold v. Harper,* 6 *N.J.* 182, 196, 78 *A.*2d 54 (1951)), *appeal dismissed,* 394 *U.S.* 812, 89 *S.Ct.* 1486, 22 *L.Ed.*2d 748 (1969). The presumption of validity "can be overcome only by proofs that preclude the possibility that there could have been any set of facts known" or assumed to be known by the drafters that would, in the exercise of reason and common sense, have allowed them to conclude that the enactment would advance the interest sought to be achieved. *Hutton Park Gardens, supra,* 68 *N.J.* at 565, 350 *A.*2d 1 (citing *Reingold, supra,* 6 *N.J.* at 196, 78 *A.*2d 54); *see also Hudson Circle Servicenter, Inc. v. Town of Kearny,* 70 *N.J.* 289, 298–99, 359 *A.*2d 862 (1976) (presumption overcome only by clear showing that ordinance is arbitrary or unreasonable). The job of a reviewing court is not to weigh the evidence for or against an enactment, or to evaluate the wisdom of the policy

choice made. *Hutton Park Gardens, supra,* 68 *N.J.* at 565, 350 *A.*2d 1. That is the backdrop for our inquiry.[8]

## V.

Applying that standard, we are satisfied that the ordinance is valid. In reaching a contrary conclusion, the trial judge took a wrong turn when he placed the burden on the Township to justify the ordinance and when he adopted a narrow and crabbed interpretation of the ordinance that focused on a single goal and elided consideration of the broader aims underlying it. In particular, he determined that the purpose of the ordinance was to ameliorate the hazards of cutting trees, such as erosion, dust, and diminution of property values, on the specific properties from which the trees were removed and concluded that an ordinance that allows tree replacement elsewhere through an escrow fund is unrelated to that goal. That is not so.

On its face, the ordinance specifically recognizes that the removal of trees on *any* property affects the "health, safety and general well-being of the inhabitants of the Township" and that trees are important ecological resources. Those findings are expressive of the broader ecological purpose that animated the ordinance.

Indeed, at trial, the Township's witness, Nagle, expanded on that subject when he testified regarding the need to maintain the overall biomass—the amount of living matter—within the Township. Further, both of the Township's witnesses embraced the

---

[8] Although we have rejected NJSBA's contention that the ordinance was enacted under the MLUL, our conclusion is of no moment to the standard of review. The same standard applies to all exercises of the police power, of which land use is one. Once a zoning decision is made and embodied in an ordinance, it is " 'presumptively valid and ... [is] not to be nullified except upon an affirmative showing that the action taken ... was unreasonable, arbitrary or capricious.' " *Rumson Estates, supra,* 177 *N.J.* at 360, 828 *A.*2d 317 (alteration in original) (quoting *Pierro v. Baxendale,* 20 *N.J.* 17, 26, 118 *A.*2d 401 (1955)). Thus, an MLUL ordinance will be sustained if there is any set of facts that would provide a rational basis for the conclusion that the means chosen will, in fact, advance the ends sought to be achieved.

commonsense notion that, regardless of the location from which a tree in the Township is removed, the effects of its removal can be mitigated by replanting a tree elsewhere in the Township.

NJSBA argues that even if the purpose of the ordinance was more expansive than that conceived by the trial judge, the means chosen by the Township will not advance that end. In particular, it urges that because large trees may be replaced by smaller trees and shrubs on public property, the ordinance does not, in any measure, achieve its stated purpose. That argument belies a fundamental misunderstanding of the standard of review—the ordinance need not be perfect in order to pass muster. *See Hudson Circle Servicenter, supra,* 70 *N.J.* at 316, 359 *A.*2d 862 (noting that ordinance not invalid because it could have done more to promote goals). In order to sustain an ordinance, it must only advance the cause it was intended to achieve.

Although it is clear, as NJSBA argues, that a tree with a smaller diameter does not immediately replace the full canopy that is lost when a much larger tree is removed, it does not follow that a smaller replacement tree has no impact at all on the Township's environment. As the Township's witnesses averred, a smaller tree can have an important and immediate impact on the Township's environment by increasing habitat and oxygen production and the biomass itself. Moreover, with time and proper care, many of the smaller trees will eventually serve to replace the lost canopy.

NJSBA's further argument that the ordinance is invalid because it permits the Township Forester to replant "shrubs" as a replacement for trees is equally unavailing. Shrubs can run the gamut from ground cover to well over fifteen feet tall.[9] Although

---

[9] "The distinction between trees and shrubs is often debated...." Ernie Wasson et al., *The Complete Encyclopedia of Trees and Shrubs* 16 (2003). Trees and shrubs are both woody perennials that renew their growth via above-ground buds. *Ibid.* The main differences between trees and shrubs are the height of the plant and number of stems. *Id.* at 16–18 ("Trees are generally defined as tall plants ... with a distinct trunk.... A shrub is by default any woody plant that meets the above test but is not big enough to be a tree.... [S]hrubs [can have]

groundcover might not constitute canopy, that is not true of a fifteen-foot shrub, and, regardless of size, a shrub advances the environmental purposes of the ordinance insofar as it preserves the overall biomass, provides habitat, removes air pollution, and produces oxygen. In allowing the replacement of trees with shrubs, the drafters could logically have recognized that shrubs, like trees, serve broad environmental purposes. *See, e.g.,* David J. Nowak et al., *Air Pollution Removal by Urban Trees and Shrubs in the United States,* 4 *Urb. Forestry & Urb. Greening* 115, 115 (2006) ("[U]rban trees *and shrubs* ... offer the ability to remove significant amounts of air pollutants and consequently improve environmental quality and human health." (emphasis added)); Andrew M. Farmer, *The Effects of Dust on Vegetation,* 79 *Envtl. Pollution* 63, 67 (1993) (trees and shrubs efficiently filter road dust). Again, in connection with this argument, NJSBA misconceives the standard of review. In effect, NJSBA argues that an all-tree, no-shrub, replacement initiative would have been a better way of achieving the Township's goals. That simply is not the test.

We also reject NJSBA's contention that the Township could not have concluded that replacing trees and shrubs on public property would advance the goals the ordinance sought to achieve. As the experts stated, replanting on public property plainly contributes to oxygen production, habitat, and the biomass as a whole. Moreover, because the Township obviously cannot mandate that trees be replanted on other private property, its attempt to mitigate the effects of tree loss on private property by promoting replanting, wherever it can, is rational.

To be sure, as all parties agree, replanting at the original location of the tree removal is optimal because it addresses all of

---

very numerous stems...."). However, those distinctions are not hard and fast. A small tree can be ten feet tall, while a large shrub can be well over fifteen feet tall. *Ibid.* Moreover, "there are many instances of plants that remain shrubs in most situations, ... but when growing undisturbed in a favorable environment become small or even medium-sized trees." *Id.* at 18.

the goals of the ordinance, including dust and soil erosion. However, where that is not feasible, as a result, for example, of "inadequate planting area," the Township mitigates the overall loss by planting off-site through the use of the escrow fund. That methodology essentially tracks the way the Department of Environmental Protection mitigates freshwater wetlands losses, by requiring a property owner who is permitted to destroy wetlands on his property to protect them elsewhere. *N.J.S.A.* 13:9B–13.

At the risk of oversimplifying this case, it seems to us that NJSBA cannot see the forest for the trees. Insistent on characterizing the goals of the ordinance as solely to remedy the evils of cutting trees on a particular piece of property, NJSBA asks us to declare that the ordinance bears no rational relationship to that goal. Even if the environmental goal is broader, NJSBA suggests that we conclude that, because there could be wiser ways to address the ripples caused by tree removal than those adopted by the Township, the ordinance is invalid. That, we will not do.

The ordinance is presumed valid. The burden was on NJSBA to overcome that presumption—a burden it failed to sustain. The Township's witnesses explained the broad environmental goals that precipitated the enactment of the tree removal ordinance, including maintenance of the biomass and the canopy with their concomitant ecological benefits. The ordinance, in our view, is one way, albeit not the only one, to achieve those goals.

We stress that "an ordinance is not invalid 'because it could have done more to combat the evils which it seeks to address.'" *Quick Chek Food Stores v. Twp. of Springfield,* 83 *N.J.* 438, 451, 416 *A.2d* 840 (1980) (quoting *Hudson Circle Servicenter, supra,* 70 *N.J.* at 316, 359 *A.2d* 862). Indeed, "[s]o long as the ordinance is reasonable, that is, not arbitrary, the existence of 'a more reasonable' ordinance is irrelevant." *Sea Watch, Inc. v. Borough of Manasquan,* 186 *N.J.Super.* 25, 32–33, 451 *A.2d* 192 (App.Div.1982). That is the case here, and the Appellate Division's contrary conclusion that the ordinance does not advance the purposes for which it was enacted cannot stand.

## VI.

 We turn, finally, to NJSBA's contention that the replacement fee is an invalid "tax." It is clear that municipalities have no inherent power of taxation. Thus, an otherwise valid fee imposed for the issuance of a license or permit constitutes an invalid tax if its primary purpose is to raise revenue. *See, e.g., Colonial Oaks W., Inc. v. Twp. of E. Brunswick*, 61 *N.J.* 560, 574, 296 *A*.2d 653 (1972) (remanding for determination of whether municipal fees "were reasonable and designed to defray regulatory costs or unreasonable and designed to obtain revenue"). However, because regulatory ordinances are presumptively valid, they "will be sustained absent proof that the fees imposed unreasonably exceed the cost of regulation." *BTD–1996 NPC 1 L.L.C. v. 350 Warren L.P.*, 170 *N.J.* 90, 100, 784 *A*.2d 1214 (2001). "The litigant asserting that a charge imposed ostensibly for regulatory purposes is in reality a tax must bear the burden of proving that allegation." *Id.* at 98, 784 *A*.2d 1214.

 NJSBA concedes that the ten-dollar application fee and the twenty-five-dollar tree removal fee listed in section G of the ordinance are legitimate initiatives designed to defray the Township's administrative costs. Its "tax" challenge is limited to the tree replacement fee. In advancing that argument, NJSBA appears to contend that the legitimate costs of regulation only include a review of the application, an inspection of the property, and the issuance or denial of the permit. We do not define "regulation" in this setting so narrowly. In the context of tree removal, regulation includes all of the above. However, where the property owner is not able to replant, a critical part of the regulatory process is the replacement fee, which enables the municipality to do the replanting itself. So long as the replacement fees do not exceed the municipality's costs for administration and replacement, they are legitimate elements of the regulatory scheme.

 Here, the payment of a fee is only one of three possible approaches to tree replacement. The first two involve replanting

one-to-one or pursuant to a tree area replacement/reforestation scheme on the property from which the trees were removed. As the Township's witnesses recognized, replanting on the original site is the scheme of choice. To encourage such replanting, the ordinance makes it the least expensive option for the landowner. If that is not feasible, the tree replacement fee is triggered. According to the testimony of the Township Forester, the fee is calculated based on the cost of replacing a tree of similar size or a number of smaller trees. NJSBA has failed to produce any evidence to suggest that the fee exceeds the Township's cost for administration of the tree replacement program, including the replacement itself. In the absence of such evidence, there is no basis to conclude that the fee is a revenue raiser or that it unreasonably exceeds the cost of regulation.

## VII.

Summing up, we hold that the Township's tree removal ordinance is a valid exercise of the police power. The details of the ordinance, including the tree replacement fee, the escrow fund, and the planting of trees and shrubs on public property where replanting at the original location is not feasible, are all rationally related to the broad environmental goals that inform the ordinance.

## VIII.

The judgment of the Appellate Division to the contrary is reversed. As we have said, the ordinance remains in limbo because of the Appellate Division's affirmance of the trial judge's ruling regarding vagueness, a ruling that was not challenged before us.

*For reversal*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA–SOTO and HOENS—7.

*Opposed*—None.